LOUISVILLE AND NASHVILLE RAILROAD COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4614-67, 5384-67.     Filed September 9, 1976.

*George K. Dunham,* for the petitioner.
*Robert A. Roberts,* for the respondent.

### OPINION

DRENNEN, *Judge:* This case was assigned to and heard by Special Trial Judge James M. Gussis pursuant to Rules 180 through 182, Tax Court Rules of Practice and Procedure. His report was filed on February 11, 1976, and subsequently both parties filed exceptions to his report. The exceptions have been considered and, for the most part, are rejected. Where appropriate, some amendments have been made to the report. The Court agrees with and adopts the report set forth below.

### OPINION OF THE SPECIAL TRIAL JUDGE

GUSSIS, *Special Trial Judge:* Respondent determined deficiencies in the petitioner's Federal income tax for the years 1955 through 1963 as follows:

| Docket No. | Year | Income tax deficiency |
|---|---|---|
| 5384-67 | 1955 | $1,147,429.18 |
|  | 1956 | 951,817.29 |
|  | 1957 | 631,617.78 |
|  | 1958 | 2,203,121.93 |
|  | 1959 | 2,034,386.54 |
|  | 1960 | 2,222,080.62 |
|  | 1961 | 815,752.76 |
| 4614-67 | 1962 | 886,243.91 |
|  | 1963 | 379,794.83 |

In amendments to the answers filed in docket No. 5384-67 and docket No. 4614-67, the respondent claimed increased defi-

ciencies in petitioner's Federal income taxes for the years 1955 through 1963 in the following amounts:

| Docket No. | Year | Increased deficiency |
|---|---|---|
| 5384-67_____ | 1955 | $177,417.66 |
| | 1956 | 555,994.67 |
| | 1957 | 739,749.57 |
| | 1958 | 447,342.50 |
| | 1959 | 170,878.34 |
| | 1960 | 543,175.29 |
| | 1961 | 838,556.37 |
| 4614-67_____ | 1962 | 594,638.51 |
| | 1963 | 753,380.38 |

In an amendment to the petition filed in docket No. 5384-67 and docket No. 4614-67, the petitioner claimed overpayments in its Federal income taxes for the years 1955 through 1963.

We must also consider several issues involving the year 1964 in order to determine the amount of the net operating loss carryback from that year to the taxable years before us.[1]

The issues remaining for decision are: (1) Whether petitioner is entitled to depreciation deductions under Section 167 of the Internal Revenue Code of 1954[2] with respect to roadway assets donated to it by various governmental bodies or constructed with funds supplied by various governmental bodies prior to June 22, 1954; (2) whether petitioner in its application of the retirement method of accounting for rail during the years 1955 through 1964 must use the current fair market value for relay rail; (3) whether the costs incurred in the years 1959 through 1964 in welding 39-foot rail into continuous welded rail are capital expenditures; (4) whether the costs incurred in the years 1959 through 1964 in heat-treating and flame-hardening rail are capital expenditures; (5) whether petitioner is entitled to a deduction in 1964 in connection with the purported abandonment or retirement of certain railroad grading and ballast; (6) whether petitioner may deduct as a charitable contribution under section 170 the fair market value of an easement conveyed in 1960 to the City of Birmingham, Ala.; and (7) whether certain costs incurred by petitioner in the freight car building and rebuilding program

---

[1] Petitioner, in its Federal income tax return for the taxable year 1964, reported a net operating loss in the amount of $9,108,464.

[2] All section references will be to the Internal Revenue Code of 1954, as amended, unless otherwise stated.

performed in its own shop facilities should be capitalized as part of the cost basis of said freight cars.

### FINDINGS OF FACT

Some of the facts were stipulated and they are so found.

The Louisville & Nashville Railroad Co. (hereinafter called the petitioner) was incorporated under the laws of the State of Kentucky on March 5, 1850. Petitioner's principal offices at the time the petitions herein were filed were in Louisville, Ky. Petitioner filed its corporation income tax return for each of the years 1955 through 1963 with the District Director of Internal Revenue, Louisville, Ky.

Petitioner is a common carrier by rail in interstate commerce subject to the jurisdiction of the Interstate Commerce Commission.

### *Donated Property*

Early in the 1900's local, State, and the Federal governments became involved in the financing of the cost of grade separations and crossing safety devices. With the increased volume of automobiles in use the various governments recognized an obligation to bear a portion of the cost for highway safety.

The need for grade separations and warning devices was generally determined by a State regulatory agency. On occasion the action of the regulatory agency would be prompted by the request of a local public agency or a citizens' group. Railroads normally participated in discussions with the regulatory agencies to determine the type of grade crossing or safety devices to be constructed or installed and also to determine the allocation of costs between the parties. Railroads could appeal determinations made by the regulatory agencies with respect to grade crossings.

Pursuant to written agreements between petitioner and various States and political subdivisions of the States, grade separations were constructed for the purpose of allowing roads and highways to cross petitioner's railroad tracks at highway and railroad intersections. These grade separations were either bridges or overpasses which carried highway traffic over the railroad tracks or tunnels or underpasses which carried highway traffic beneath the railroad tracks. Also pursuant to agreements between petitioner and various States and their political subdivisions, and in some instances in conformance with State

statutes and city ordinances requiring railroad-highway crossing safety devices, grade-crossing protective equipment was installed at intersections of highways and tracks which were not separated by a difference in grade. The electronic automatic intersection protective devices were connected with the signal and communications system used by petitioner as a part of its track system. In some instances the safety devices were manually operated. After their installation the safety devices and equipment were maintained by the petitioner.

Under the provisions of Federal highway aid legislation beginning with the Highway Act of 1916 and particularly the Federal Highway Act of 1933, ch. 90, 48 Stat. 203, and the Federal Aid Highway Act of 1944, ch. 626, 58 Stat. 838, the Federal, State, and local governments paid all or a portion of the cost incurred in constructing the grade separations and grade-crossing equipment. These facilities were constructed primarily to benefit the general public through improved safety and traffic flow. Petitioner also received incidental benefits from the facilities such as the probability of lower accident rates and the ability to operate its trains at higher speed limits. Grade separation projects frequently eliminated the need for a warning safety device and in some cases eliminated the need for a crossing watchman.

The railroad crossing safety devices that were installed prior to June 22, 1954, pursuant to contracts with various governmental bodies, were all installed by petitioner's personnel. The reasons for this were (1) that under petitioner's labor agreements with the Brotherhood of Railroad Signalmen only employees of the petitioner were allowed to install and maintain signal equipment on petitioner's property, and (2) that petitioner could not leave the installation of such devices to a third party because many of the crossing signals were connected with other signal and communication equipment of the petitioner.

None of the agreements executed between petitioner and the various governmental bodies with respect to grade separations contained provisions with respect to the legal title in the facilities constructed. The actual installation of grade-crossing equipment and devices was performed by petitioner which also undertook the subsequent maintenance of such equipment and facilities. Under all the agreements petitioner was required to obtain the permission of the State regulatory authority before moving the grade-crossing equipment to a new site.

Petitioner recorded the portion of the costs it paid for grade separations in Account 6 (bridges, trestles, and culverts) or Account 39 (public improvements; construction). During the taxable years here involved the petitioner claimed straight-line depreciation for Federal income tax purposes with respect to such costs at the following rates:

| Account No. | Year | Rate |
|---|---|---|
| 6 | 1955 | 1.55 |
| | 1956-61 | 2.01 |
| | 1962-63 | 3.33 |
| | 1964 | 3.33 |
| 39 | 1955 | 1.44 |
| | 1956-61 | 1.83 |
| | 1962-63 | 3.33 |
| | 1964 | 3.33 |

The cost of the above grade separations, constructed prior to June 22, 1954, which was incurred by the Federal, State, and local governments was in the total amount of $13,827,597. None of this cost was capitalized on petitioner's books and records and until the amendment to its petitions filed in these cases the petitioner did not claim depreciation with respect to such costs. In 1957 petitioner merged with the Nashville, Chattanooga & St. Louis Ry. Co. Prior to June 22, 1954, the Federal, State, and local governments had incurred costs of $1,172,067 in the construction of grade separations with respect to the tracks of the Nashville, Chattanooga & St. Louis Ry. Co. which neither capitalized such costs on its books and records nor claimed any depreciation with respect to such costs.

Petitioner recorded the portion of the cost it paid for the railroad crossing protective devices in Account 27 (signals and interlockers). During the taxable years here involved the petitioner claimed depreciation on a straight-line basis for Federal income tax purposes with respect to such costs at the following rates:

| Year | Rate | Year | Rate |
|---|---|---|---|
| 1955 | 2.50 | 1962-63 | 7.14 |
| 1956-61 | 2.88 | 1964 | 7.14 |

The cost of the above railroad crossing equipment, constructed and installed prior to June 22, 1954, which was incurred by the Federal, State, and local governments was in the total amount of $561,892. Such cost was not capitalized on the books and records

of petitioner and until the amendments to its petitions filed in these cases the petitioner did not claim depreciation with respect to such costs.

In the amendments to the petitions the petitioner now claims depreciation in the years here involved with respect to the costs of the grade separations and the railroad crossing equipment and devices which were installed prior to June 22, 1954, and incurred by the Federal, State, and local governments.

On March 19, 1943, petitioner requested permission from the Internal Revenue Service to change its method of depreciating roadway property from the retirement method to the ratable depreciation method. On April 15, 1943, the Internal Revenue Service requested pertinent information from petitioner under the guidelines in respondent's Mimeograph 58 which stated the terms under which the changeover in accounting practice would be granted and described the information to be furnished. Mimeograph 58 specifically provided that "Donated property or contributions or grants in aid of construction from any source must be excluded" from the depreciable basis. On May 30, 1944, the Internal Revenue Service, in a letter which incorporated the information supplied by petitioner and outlined the relevant terms and conditions, granted petitioner's request to change from retirement to depreciation accounting as of January 1, 1943. Petitioner accepted the said terms and conditions on June 8, 1944, with the understanding that "if the conditions under which railroads are granted permission to change from retirement to depreciation accounting as set forth in your letter of May 30, 1944, are amended for the benefit of railroad taxpayers, the fact that Louisville and Nashville Railroad Company has irrevocably agreed to the conditions contained in said letter shall not preclude it from the benefit of any changes in those conditions which are applicable to railroads in general."

In 1961 petitioner submitted to the Internal Revenue Service revised schedules for depreciable roadway property and re-quested the benefit of section 94 of the Retirement-Straight Line Adjustment Act of 1958. In its response to petitioner's request the Internal Revenue Service noted the terms letter of 1944 and stated that petitioner's revised schedules were acceptable. The revised schedules of depreciable property submitted by petitioner in 1961 did not include the facilities (overpasses,

underpasses, and grade-crossing protective equipment) at issue herein.

## Relay Rail

During the years 1955 through 1964, and at all other times here relevant the petitioner used the retirement-replacement-betterment method of accounting (hereinafter the retirement method) for its track accounts (including its rail and other track materials). Under the petitioner's application of the retirement method of accounting all rail and other track materials are carried on petitioner's books at stated values. When a particular asset (such as a section of rail) is retired from service without being replaced its stated value on petitioner's books is charged to operating expenses. The retired asset is then assigned a salvage value on petitioner's books (as reuseable rail or as scrap) and such value is credited to (and thus reduces) operating expenses. When a particular asset such as rail is replaced in kind rather than simply retired the cost of the replacement is charged to operating expenses and the assigned salvage value of the replaced rail is credited to operating expenses. If the rail laid in replacement is new its cost as new rail is expensed. If the rail laid in replacement is used rail the amount expensed is the assigned salvage value of the used rail as carried on petitioner's books. For example, if 80-pound rail is replaced by 80-pound rail the cost of the replacement is expensed and the value assigned to the replaced rail (as reuseable rail or as scrap) is credited to operating expenses.

When a replacement involves a betterment, the portion of the replacement considered to be a betterment is capitalized. For example, if a section of 80-pound rail is replaced with 100-pound rail the amount attributable to the extra 20 pounds is capitalized and the balance (reduced by the salvage value of the 80-pound rail picked up) is currently expensed.

Under the retirement method of accounting as used by petitioner the current costs or assigned costs of laying additional rail are capitalized. This investment in the track accounts (original track structure and all additions thereto) remains on petitioner's books and records until that section of track is actually retired. No ratable deduction is claimed and no depreciation reserve is maintained for assets accounted for under the retirement method.

Relay or reuseable rail is rail that has been picked up or recovered by petitioner from one line of its track and is in sufficiently good condition to be relaid later in another line of track. Scrap rail, which is rail that is picked up or recovered and has no remaining usefulness to petitioner as rail, is sold as scrap metal. During the period 1955 through 1964 petitioner assigned a value of $40 per net ton to reuseable rail recovered from its tracks. Rail picked up and classified as scrap was assigned a value of $30 per net ton.

In its program for replacing rail in its track lines the petitioner from time to time installs sections of heavier weight to replace rail of lighter weight. Reuseable rail taken up from main rail lines is usually relaid on a branch line or secondary line, while reuseable rail taken up from secondary lines or branch lines is usually relaid in yard tracks or industry tracks.

During the period from 1955 through 1964 the average price per net ton paid by petitioner for new rail was as follows:

| Year | Average price per net ton | Year | Average price per net ton |
|---|---|---|---|
| 1955 | $93.70 | 1960 | $116.50 |
| 1956 | 97.37 | 1961 | 116.50 |
| 1957 | 105.50 | 1962 | 116.50 |
| 1958 | 116.50 | 1963 | 116.50 |
| 1959 | 116.50 | 1964 | 117.75 |

During the years 1955 through 1964 petitioner sold rail which it had classified as scrap for an average price per net ton as follows:

| Year | Average price per net ton | Year | Average price per net ton |
|---|---|---|---|
| 1955 | $46.01 | 1960 | $46.70 |
| 1956 | 64.72 | 1961 | 43.58 |
| 1957 | 57.59 | 1962 | 36.15 |
| 1958 | 40.93 | 1963 | 33.82 |
| 1959 | 35.50 | 1964 | 35.21 |

Petitioner's books and records reflect an inventory of reuseable or relay rail in its stores account at the end of each of the years 1954 through 1964 as follows:

| Year | Relay rail inventory (net tons) | Year | Relay rail inventory (net tons) |
|---|---|---|---|
| 1954 | 18,903.79 | 1960 | 13,831.48 |
| 1955 | 10,715.23 | 1961 | 11,064.48 |
| 1956 | 11,884.78 | 1962 | 16,022.52 |
| 1957 | 23,224.28 | 1963 | 14,110.17 |
| 1958 | 21,293.09 | 1964 | 27,908.84 |
| 1959 | 15,854.51 | | |

During the years 1955 through 1963 petitioner picked up reuseable rail and scrap rail from its tracks in the following amounts:

| Year | Reuseable and scrap rail picked up (net tons) | Year | Reuseable and scrap rail picked up (net tons) |
|---|---|---|---|
| 1955 | 39,385 | 1960 | 19,717 |
| 1956 | 35,408 | 1961 | 13,408 |
| 1957 | 51,590 | 1962 | 11,641 |
| 1958 | 30,151 | 1963 | 23,610 |
| 1959 | 28,369 | | |

During the years 1955 through 1963 petitioner sold scrap rail in the following amounts:

| Year | Sales of scrap rail (net tons) | Year | Sales of scrap rail (net tons) |
|---|---|---|---|
| 1955 | 21,528 | 1960 | 5,305 |
| 1956 | 13,321 | 1961 | 5,429 |
| 1957 | 13,381 | 1962 | 2,828 |
| 1958 | 11,523 | 1963 | 2,911 |
| 1959 | 11,588 | | |

During the years 1955 through 1963 petitioner laid reuseable rail in additional tracks or extension in the following amounts:

| Year | Reuseable rail laid (net tons) | Year | Reuseable rail laid (net tons) |
|---|---|---|---|
| 1955 | 651.03 | 1960 | 2109.26 |
| 1956 | 815.86 | 1961 | 4063.74 |
| 1957 | 2265.64 | 1962 | 6180.34 |
| 1958 | 7775.63 | 1963 | 14154.59 |
| 1959 | 2841.71 | | |

During the years 1955 through 1963 petitioner laid reuseable rail in net betterments in the following amounts:

| Year | Reuseable rail laid (net tons) | Year | Reuseable rail laid (net tons) |
|---|---|---|---|
| 1955 | 1916.23 | 1960 | 786.53 |
| 1956 | 2320.34 | 1961 | 668.40 |
| 1957 | 2685.18 | 1962 | 354.38 |
| 1958 | 2342.89 | 1963 | 791.45 |
| 1959 | 1815.18 | | |

In the amendments to the answers filed in docket No. 5384-67 and docket No. 4614-67, the respondent claimed that petitioner's use of a salvage value of $40 per ton for relay rail and other track materials in computing operating expenses under the retirement method of accounting for each of the years 1955 through 1963 was incorrect. In his adjustment the respondent used the actual salvage value, i.e., fair market value of the relay rail and other track materials which had the effect of a corresponding decrease in the operating expenses claimed by petitioner as deductions in the taxable years involved. The adjustment was made by first determining the amount of relay rail that was taken up from petitioner's track system for each of the years here involved and then reducing that amount by the tonnage of relay rail installed in straight replacement. Respondent then multiplied this net tonnage of relay rail by the difference between petitioner's assigned value of $40 per ton for relay rail and the fair market value of such rail as determined by respondent. Respondent has now conceded the adjustment for each of the years 1955 through 1963 insofar as it pertains to the salvage value assigned to other track materials.

In the revenue agent's report covering petitioner's taxable year 1964 a similar adjustment was made to petitioner's assigned salvage value for relay rail which resulted in a disallowance of petitioner's claimed deduction for operating expenses in 1964 to the extent of $978,561.77.[3]

### Welded Rail

Rail is rolled and manufactured in 39-foot lengths. Prior to 1959 the standard length rails in petitioner's track system were joined together by the use of angle bars and bolts.

The joints between segments of rail are the weakest points in a track structure. Due to the discontinuity of rail surfaces at the joints, the loosening of bolts, and the wear in the contact area between the rail and the joint bars, problems are caused by the

---

[3] Respondent computed this amount ($978,561.77) by multiplying the number of tons of relay rail laid in additions and betterments and the increment in the relay rail inventory during the year 1964 by the difference between the fair market value of such relay rail and the salvage value of $40 assigned by petitioner to such relay rail.

Respondent used a method to determine the amount of additions and betterments during the year 1964 which differed from the method he used to determine such amounts during the years 1955-63. The parties have stipulated that respondent's use of a different method has resulted in a duplication of about 9,000 tons.

battering of the rail ends. Primary batter is the flattening of the rail end due to the discontinuity in the rail surface at the joint. Secondary batter, which usually occurs on the surface of the receiving rail at the joint, results from a rebound or descending blow on the receiving rail and causes a flattening of the rail end. Primary and secondary batter are constant problems with jointed rail.

Imperfections in the rail surface resulting from primary and secondary batter are corrected by the use of a work train which consists of a series of cars mounted with grinding wheels. This grinding process covers the entire 39-foot section of rail and is not limited to the rail in the batter area.

Loose bolts in a rail joint assembly increase primary and secondary batter, and unless such bolts are tightened, the wear on railroad ties is accelerated and moisture is allowed into the ballast area leading to a general deterioration of the track structure in the vicinity of the rail joint.

A rail joint bar has about one-half the strength of the rail itself. To maintain the rigidity of the joint bar and avoid excess stress on the rails it is necessary to tighten the joint bar bolts during the course of periodic maintenance, usually once a year.

In 1959 petitioner began to replace sections of its jointed track system with continuous welded rail. One of the reasons for the installation of welded rail in petitioner's track system was to eliminate rail joint problems. From approximately March to November 1959 petitioner leased facilities and equipment from Linde Co. where petitioner's employees welded the rail. From about November 1959 through the year 1964 petitioner obtained welded rail under contracts with Linde Co. Standard 39-foot lengths of rail were used in the welding process. In some instances during the period from November 1959 through the year 1964 petitioner bought new rail and shipped it to Linde Co. for welding and in other instances petitioner purchased the finished product, i.e., strings of welded rail, from the Linde Co. The welded rail installed by petitioner during the years 1959 through 1964 was usually in lengths of 1,053 feet and, in some cases, 78 feet.

During the years here relevant petitioner, in installing welded rail, used a 39-foot rail or a rail one-half the standard length as a buffer rail between each string of welded rail. With this type of installation the number of bolted joints could be reduced from

about 265 to 8 per mile of track. In the installation of welded rail, as compared to jointed rail, a greater number of rail anchors is required. A rail anchor is a device attached to the base of the rail and bears against the side of the ties to control the movement of the rail. The additional rail anchors are necessary to control the expansion and contraction of welded rail due to temperature changes and to maintain the alignment of the welded rail. Consequently the ballast requires increased maintenance to preserve the anchorage between tie and ballast section.

The welded area of continuous welded rail is as strong as the adjacent rail on either side and will last as long as the rail itself. The welded areas of continuous welded rail eliminate the problems normally associated with rail joints and thus require less maintenance. Primary and secondary batter do not generally occur with welded rail. A welded area may contain surface irregularities because of some misalignment of the rail in the welding process. Such surface irregularities are removed by grinding.

Welded rail requires periodic inspections to avoid buckling conditions that do not normally occur with jointed rail. The use of welded rail also creates special problems at the points where the strings of welded rail are bolted together. The bolts bend more rapidly and require more frequent replacement. When welded rail develops a defect it is necessary to cut the section out of the track and replace it with a new section that may be welded or bolted in place. Special equipment and specially trained employees are needed to make the weld. The costs of maintaining continuous welded rail are less than the costs of maintaining jointed rail.

The process known as "out of face" surfacing involves the periodic resurfacing of track to obtain a smooth surface. Additional ballast is used to build up the low places along the track and in order to accomplish this it is necessary to pick up the rail in that entire section. "Out of face" surfacing requires the compacting of ballast under each individual tie over the entire length of the section of track being surfaced. A jointed track system should normally be surfaced in this way every 5 or 6 years. With continuous welded rail the cycle for this operation can be extended to every 8 or 9 years.

In 1957 there was a total of 550 miles of welded rail installed in the track systems of all railroads in the United States. At the

end of 1969, 25,742 miles of welded rail had been installed. By 1973 about 75 percent of the steel rail manufactured was "blank" end for eventual welding into strings of continuous welded rail.

During the years 1959 through 1972 petitioner installed welded rail in its track systems as follows:

| Year | Miles of welded rail installed | Total miles installed at year end |
|---|---|---|
| 1959 | 37.96 | 37.96 |
| 1960 | 38.36 | 76.32 |
| 1961 | 22.61 | 98.93 |
| 1962 | 22.95 | 121.88 |
| 1963 | 52.73 | 174.61 |
| 1964 | 38.11 | 212.72 |
| 1965 | 56.04 | 268.76 |
| 1966 | 97.44 | 366.20 |
| 1967 | 137.10 | 503.30 |
| 1968 | 194.26 | 697.56 |
| 1969 | 212.31 | 909.87 |
| 1970 | 218.33 | 1,128.20 |
| 1971 | 262.81 | 1,391.01 |
| 1972 | 147.34 | 1,538.35 |

When petitioner replaced sections of jointed track during the years here relevant with strings of welded rail of the same pattern weight it deducted as an operating expense the full cost of the welded rail, including the cost of the welds. Where welded rail was laid to replace sections of jointed rail of lesser pattern weight, petitioner capitalized that portion of the cost of welded rail (including the cost of welds) that was attributable to the increase in weight and deducted as an operating expense the remaining cost of the welded rail (including the cost of the welds).

When a string of welded rail 1,053 feet in length was installed to replace a similar length of jointed track a large number of angle bars and bolts previously used to join the 39-foot lengths of jointed track were removed from the track structure. Petitioner deducted as operating expenses the historical costs of such removed materials, less assigned salvage values.

Prior to December 1965 it was the policy of the ICC that the costs of welding rail laid in replacement were to be expensed for book purposes. On December 22, 1965, the ICC after an examination of petitioner's accounts, advised petitioner that contrary to petitioner's accounting practice the expenditures pertaining to the costs of welding rail should be included in the "property

account." On March 2, 1966, petitioner advised the Interstate Commerce Commission that not later than April 1, 1966, it would correct its accounting practices relating to welding costs in accordance with the exception previously noted by the Interstate Commerce Commission.

In the statutory notices of deficiency in docket Nos. 4614-67 and 5384-67 respondent determined that the deductions claimed by petitioner for costs pertaining to welding the 39-foot rail sections together during the years 1959 through 1963 were capital expenditures and therefore disallowed the deductions in the following amounts:

| Year | Cost of welds | Year | Cost of welds |
|------|--------------|------|--------------|
| 1959 | $98,502.56 | 1962 | $44,396.29 |
| 1960 | 89,555.28 | 1963 | 91,670.00 |
| 1961 | 42,721.35 | | |

Similarly, in the revenue agent's report for the taxable year 1964, the petitioner's claimed deduction of $85,486.99 relating to the cost of welding rail for the year 1964 was held to be a capital expenditure rather than a currently deductible expense.

### Heat-Treated Rail

The service life of rail, from the date first installed until picked up and sold as scrap, may vary from 6 months to 60 years, with an average life of between 40 and 50 years. This range in service life is attributable to a number of factors, including the location of the rail in the track system, the speed and tonnage of the traffic, the condition of the roadbed and the maintenance practices of the carrier. Rail on a curve will wear much faster than rail on a tangent track. The life of rail used on curves in petitioner's track system generally ranged from 6 months to 15 years depending upon the degree of the curve and the extent and nature of the traffic.

In 1963 and 1964 petitioner installed heat-treated and flame-hardened rail in various sections of its track system. In those years the heat-treated and flame-hardened rail was installed only on curves located on the main lines of petitioner's track system.

Rail is flame-hardened by the application of a torch plate to the rail surface, which process hardens the top of the rail to a depth of approximately one-quarter of an inch. The heat-treated rail used in petitioner's track system was hardened by the

induction method, which process hardened the rail throughout its entire configuration. Imperfections existing in the steel used originally for the rail could be aggravated by the heat-treating or flame-hardening process, giving rise to defects in the rail.

Petitioner installed heat-treated and flame-hardened rail on curves in order to extend the service life of rail in those segments of its track system. Petitioner's experience with heat-treated and flame-hardened rail installed on curves indicated that such rail had approximately 2½ times the service life of regular rail. In 1963 and 1964 the average cost new of regular rail used in petitioner's track system was approximately $120 per net ton. During those years the cost of flame-hardened rail was approximately $160 per net ton while heat-treated rail ranged in price from $194.89 per net ton in 1963 to $197.52 per net ton in 1964. Petitioner continued to install both flame-hardened and heat-treated rail in its track system during the years 1965 through 1969. After the year 1969 petitioner installed only heat-treated rail in its system.

In 1963 and 1964 petitioner deducted the full cost of the heat-treated and flame-hardened rail when such rail was laid to replace rail of the same pattern weight. When the heat-treated and flame-hardened rail was of heavier pattern weight than that which it replaced, petitioner capitalized only that portion of the cost of the heat-treated and flame-hardened rail attributable to the increase in weight and expensed the remaining cost of such rail.

Respondent determined in the statutory notice of deficiency in docket No. 4614-67 that petitioner's claimed deduction for the year 1963 in the amount of $84,530.74 representing the cost of flame-hardening and heat-treating rail was a capital expenditure and therefore not deductible. Similarly, in the revenue agent's report covering the year 1964 the petitioner's claimed deduction in the amount of $42,691.16 representing the cost of flame-hardening and heat-treating rail is held to be a capital expenditure rather than a currently deductible expense.

### Centralized Traffic Control—Abandonment Loss

During the year 1964 petitioner installed centralized traffic control along the segment of its track between Winchester, Ky., and Corbin, Ky. Centralized traffic control is an electrical signal system which, through the use of switching equipment and

bypass tracks, enables the movement of trains over a single track system on a line which previously required two parallel track systems. Petitioner had been engaged in a program of installing centralized traffic control along various portions of its track system since 1955. Centralized traffic control was installed on main lines of petitioner's track system regardless of when the rail on those lines had been previously replaced.

In 1964, following the installation of centralized traffic control, large sections of petitioner's parallel track system between Winchester and Corbin were removed. Rails, other track materials, and ties were taken up, leaving in those areas a single line of track with occasional bypass tracks. On straight track the remaining single track was on occasion realigned from one side to the other of the existing roadbed. On curves the entire roadbed was occasionally used by starting the remaining single track on the old northbound main line and ending around the curve on the old southbound main line. Such realignment of the single track on curves served to reduce the degree of curve and thus reduce wear on the rails.

The number of bypass tracks required in the installation of a centralized traffic control system depends upon the density of traffic over that segment of the line. At some time subsequent to 1964 petitioner added one additional bypass track to its centralized traffic control installation between Winchester and Corbin. The additional bypass track was installed over the roadbed where the second track had been removed in connection with the original centralized traffic control installation.

Grading, as applied to railroad construction, includes the cost of clearing and grading the roadway and the cost of constructing protection for the roadway, tracks, embankment, and cuts. Under the uniform system of accounts prescribed by the Interstate Commerce Commission grading includes, inter alia, expenditures pertaining to berm ditches, blasting, breakwaters, bulkheading, clearing land, dikes, ditches, dressing slopes, excavations for conversion of tunnels into open cuts, and retaining walls.

Unlike the rails, other track materials and ties which petitioner physically removed when the centralized traffic control system was installed, the underlying grading for the double track system between Winchester and Corbin is still in place. Except for those areas where ballast has been spread to

form a road, the underlying ballast for the parallel track system also remains in place for the most part. With the grading and ballast still in place, additional drainage protection, particularly in cuts, and some protection from falling rocks and landslides are provided for the remaining track between Winchester and Corbin.

In some places between Winchester and Corbin the portion of the roadbed from which the one track had been removed was used as a road for petitioner's automotive vehicles which provided ready access for petitioner's maintenance of the roadbed and the remaining track. In some places the available roadbed was also used on occasion by petitioner for the temporary storage of supplies and materials.

Petitioner, in its Federal income tax return for 1964, claimed retirement deductions (less assigned salvage values) for rails, other track materials, and ties which were removed in connection with the centralized traffic control installation. In addition, petitioner claimed retirement deductions in 1964 for engineering, tunnels, bridges, grading, and ballast in connection with the installation of the centralized traffic control system. The deductions for grading and ballast, in the respective amounts of $539,660.18 and $296,090.93, were based upon the assumption that the grading and the ballast that supported the retired track between Winchester and Corbin were retired or abandoned.

The amount of grading purportedly retired was computed by petitioner with reference to the profiles of the section of track where centralized traffic control was installed. Using as a standard the distance of 13 feet that separates the track centers on double track lines the petitioner determined that 13 feet of grading was retired as the result of the centralized traffic control installation where the installation was in a section of the track system having two parallel tracks. The distance of 13 feet was measured from the outside edge of the grading toward the center of the track that was removed. By plotting this amount on the profile of the grading section, a percentage of the grading deemed unnecessary due to the retirement of the track was computed. This percentage was then applied to the total cubic feet of grading shown by petitioner's records in that section of the track to determine the cubic yards and cost of the material to be retired. In making this determination the petitioner made an allowance for the section of the grading beneath a bypass track.

In those instances where two main lines diverged the petitioner included in the computation of the retirement deduction all of the grading and ballast associated with the track that was removed.

Petitioner's claimed retirement deduction for grading in the amount of $539,660.18 was disallowed in the revenue agent's report for the taxable year 1964. Petitioner's claimed retirement deduction for ballast was also disallowed to the extent of $250,359.37.

### Birmingham Easement

In 1959 petitioner's passenger station in Birmingham, Ala., was located in the vicinity of Morris Avenue and 19th Street. For some years prior thereto petitioner had planned construction of a new passenger station in that city and on June 19, 1959, petitioner entered into a contract with the B.S.T. Corp. pertaining, inter alia, to the construction of a new passenger station upon land owned by petitioner adjacent to the west side of 19th Street on Morris Avenue. On March 7, 1960, petitioner and the B.S.T. Corp. executed a supplemental agreement pertaining to the demolition of certain buildings in the vicinity of the new passenger station. It was anticipated at that time that the new passenger station then under construction would be completed on or about April 15, 1960.

The June 19, 1959, contract between petitioner and the B.S.T. Corp. provided in part as follows:

THIS CONTRACT made and entered into this 19th day of June, 1959, by and between B.S.T. CORPORATION, an Alabama corporation, Birmingham, Alabama, First Party, and LOUISVILLE AND NASHVILLE RAILROAD COMPANY, a Kentucky corporation, 908 West Broadway, Louisville, Kentucky, Second Party:

WITNESSETH

That for and in consideration of the mutual agreements hereinafter set out, the parties hereto do agree as follows:

A. First Party agrees:

(1) That it will cause to be constructed by a good, competent and reliable contractor to be selected by it (a) a building suitable for use as a railroad passenger station, ticket office and baggage facility, and appurtenances thereto, including, without limitation, parking lot, driveways and sidewalks, * * *

The passenger station building, etc., shall be constructed upon that land now belonging to Second Party and located on Morris Avenue between 18th and 19th Streets in Birmingham, Alabama, * * *

* * *

B. Second Party agrees:

(1) That upon the conveyance to it by First Party of title to the buildings, the construction of which is contemplated herein, free and clear of all liens, claims and encumbrances, and upon the payment to it of Forty-Seven Thousand ($47,000) Dollars in cash, together with the balance, if any, in the contingent fund required by paragraph A. (3) hereof, Second Party will convey to First Party, by full warranty deed, and free and clear of encumbrances, title to that certain lot of land, and the improvements thereon, located at the southwest corner of Morris Avenue and 20th Street in Birmingham, Alabama, said lot measuring one hundred fifteen (115) feet on 20th Street and four hundred ten (410) feet on Morris Avenue, * * *

On or about April 26, 1960, petitioner conveyed an easement (100 by 260 feet) to the City of Birmingham for the City's planned extension of 19th Street southward from Morris Avenue and its construction of the 19th Street underpass beneath petitioner's property. The section conveyed by petitioner to the City contained the old subway used by petitioner's passengers. The fair market value of the easement conveyed by petitioner to the City was approximately $200,000. This did not include the value, if any, of the old passenger subway (or any other improvement), which subway had a basis on petitioner's books as of January 1, 1960, of approximately $7,000.

The City of Birmingham, in consideration of petitioner's agreement to convey said easement, agreed to construct at the City's expense a new passenger subway and a baggage room in connection with petitioner's new passenger station on the west side of 19th Street on Morris Avenue. The City of Birmingham also agreed to install at its own expense a new transformer room for petitioner's new passenger station, subway, and related facilities. The cost incurred by the City of Birmingham in constructing petitioner's new passenger subway, baggage room, and transformer room was approximately $175,000.

The April 26, 1960, agreement between petitioner and the City of Birmingham provided in part as follows:

WHEREAS, the City is planning the Improvement of its Nineteenth Street, which is presently restrained from being continuous by properties of the Railroad and others, and

WHEREAS, as part of said improvement, the City demands that it be authorized and permitted to construct an underpass with necessary approaches to permit the continuation of Nineteenth Street across and under the right-of-way, tracks and passenger station facilities of the Railroad, * * *
* * *
NOW, THEREFORE, the parties hereto, in consideration of the mutual covenants and agreements herein contained, do hereby convenant and agree, each with the other as follows:

1. The Railroad, so far as it legally may and without warranty of title, will without cost to the City other than the performance of this contract, grant and convey unto the City by instrument executed contemporaneously herewith an easement in perpetuity for the purposes of constructing, extending and maintaining Nineteenth Street over and across the property of the Railroad and under its tracks by means of the said underpass and its approaches; * * *

In 1960 petitioner abandoned its old passenger station and also retired the passenger subway, baggage room, and transformer that had served the old passenger station. On or about October 14, 1960, petitioner conveyed to the B.S.T. Corp. the parcel of land comprising 47,150 square feet, with improvements thereon, located at the southwest corner of Morris Avenue and 20th Street in the city of Birmingham.

Petitioner, in its Federal income tax return for 1960, reported no gain or loss and claimed no deduction in connection with the above transaction with the City of Birmingham. In its petition filed in docket No. 5384-67 petitioner alleged that it is entitled to a deduction for a charitable contribution in 1960 in the amount of $306,388.64 representing the purported fair market value of the easement conveyed by the petitioner to the City of Birmingham.

### Overhead Expenses—Building and Rebuilding Freight Cars

Railroads customarily charge a fee, usually called per diem, for their freight cars operated on the line of another railroad. Originally the per diem rate was computed on a mileage basis but subsequently a flat rental rate of $2.88 per day was charged for each freight car. In 1964 the American Association of Railroads (AAR) instituted variable per diem rates in the railroad industry (effective January 1, 1964) ranging from a daily charge of $2.16 to $7.74, depending upon the actual cost of the freight car. In order to determine said cost of the freight cars which were built or rebuilt by the railroad itself a formula was developed by the AAR which started with the cost of such cars as recorded on the railroad's books and then added various additives. The additives contained in the AAR formula included payroll taxes, vacation pay, holiday pay, health and welfare benefits, shop and powerplant repairs, shop and powerplant maintenance, shop maintenance, superintendence at the shop, general office engineering, insurance, property taxes, shop switching, personal injuries, working capital, dead haul costs, and stock of capitalized

The percentages employed by the AAR formula for payroll taxes, vacation pay, holiday pay, and health and welfare benefits were derived from the Chicago General Manager's Agreement among participating railroads relating to the percentages for such items that would be charged on joint facilities expenditures, that is, the amount the participating railroads agreed to charge when one railroad performed work for another railroad. The remaining additives which were added to the book cost of the freight cars under the AAR formula were computed on the basis of various allocation formulas.

For some years prior to 1960 the rental of freight cars had been an important source of income for petitioner but had been diminishing in the years immediately preceding 1960. In 1959 petitioner earned $6,609,679 in rentals, while in 1960 the amount earned from this source declined to $5,369,839. In 1960 petitioner had various repair tracks located throughout its track system where running or light repairs could be made to its freight cars. Heavy repairs to petitioner's freight cars were performed at its maintenance shop in South Louisville, Ky., where petitioner had maintained a freight car repair shop since 1903. In 1960 petitioner began to improve its facilities for repairing freight cars and embarked on a program for rebuilding freight cars and for the purchase of new freight cars.

In 1960 an assembly line technique was adopted for rebuilding or renewing the entire body of a freight car at one time. Construction was begun in or about 1960 on a new shed for housing the assembly line indoors and when it was completed in 1963 the freight car shop building covered an area approximately 1,700 feet in length and about 300 feet in width.

Petitioner began to rebuild freight cars on its assembly lines at the South Louisville shop in March 1960 and the rebuilding program continued for each of the years through 1964. In the years 1962, 1963, and 1964 petitioner also built new freight cars in the South Louisville shop. The assembly lines at the South Louisville shop were set up like automobile assembly lines. One track was set up for rebuilding boxcars and a separate track was used for rebuilding hopper cars. Tracks adjacent to the boxcar track and the hopper car track contained cars with materials used in the building programs. In 1964 approximately 300 employees were involved in the building and rebuilding program at the South Louisville shop.

Freight cars that were to be rebuilt were first routed to the dismantling yard. Boxcars were generally completely dismantled

leaving only the hull and the truck assembly underneath while, in the case of hopper cars, the complete body would be removed. In the freight car repair shop, new floors, linings, doors, and roof sheets were installed on the stripped-down chassis of the boxcar being rebuilt. In addition, any other items that were needed were placed on the car. In the case of hopper cars, a new body would be constructed on the chassis after it was brought into the freight car repair shop. After the boxcars and hopper cars had been rebuilt they were moved to the truck pit where the truck assemblies were dismantled and all the journal brass, wedges, and lubricators were renewed, new brake shoes were installed and, if required, new wheels and new brake beams were also installed.

Petitioner rebuilt the following number of freight cars during the years 1960 through 1964: [4]

| Year | Freight cars rebuilt | Year | Freight cars rebuilt |
|------|------|------|------|
| 1960 | [1] 1,151 | 1963 | [2] 616 |
| 1961 | [1] 2,539 | 1964 | [2] 1,966 |
| 1962 | [2] 1,282 | | ———— |
| | | | 7,554 |

[1] Hopper cars.
[2] Includes both boxcars and hopper cars.

Petitioner built approximately 100 new freight cars at its South Louisville shop during the years 1962, 1963, and 1964. During the period 1960 through 1964 petitioner also built new cabooses at the shop.

Petitioner's engineering department at the South Louisville shop prepared the requisitions for all materials used in the freight car building and rebuilding program during the years 1960 through 1964. The engineering department also prepared various blueprints in connection with these programs and worked on joint problems with suppliers. During this period the engineering department at the South Louisville shop had a staff of about 8 to 10 employees.

Petitioner used four tracks at its South Louisville shop for building and rebuilding freight cars. These tracks had previously been used for the heavy maintenance work performed at the

[4] These figures were taken from petitioner's stockholder reports (Exh. CN). Respondent claims that a total of 9,495 cars were rebuilt during the period, with most of the increase occurring in 1964. A possible explanation of this discrepancy is that respondent looked to a source of information for 1964 which differed from his sources for the prior years. We cannot reconcile his figures for 1964.

shop. In addition to the freight car shop, the South Louisville facility also contained a paint shop, an airhose room for mounting and testing new hoses, a wheel and axle shop, a black-smith shop, a planing mill, a truck shop, and a heavy repair shop. A locomotive repair facility was also located in a back shop at South Louisville and a diesel repair shop was located at one end of the building. In addition to work performed on the equipment directly, the South Louisville shop was also used to perform work and services on items of equipment and materials used by the other repair facilities maintained by petitioner along its various lines and divisions.

All work done under the freight car rebuilding program was done in accordance with an AFE (authority for expenditure) which would authorize expenditure for construction or reconstruction of a stated number of boxcars, hopper cars, or cabooses. After the AFE was authorized and the material pur-chased, the freight car shop would advertise pursuant to union regulations that a rebuilding program was about to begin. Employees in the shop were entitled to bid for jobs in the program and such bids were honored on the basis of seniority. A shop order was prepared for the AFE and the wages and salaries of all personnel working on the rebuilding program were charged to the shop order. All wages and material expended on the rebuilding program were included in the AFE and when said program was completed the costs as recorded in the AFE were capitalized by petitioner as the cost of the rebuilt freight cars.

Petitioner also capitalized as part of the cost of the rebuilt freight cars its adjusted basis in the parts and materials salvaged from the dismantled cars and reused in the rebuilding program. Some materials used in the building and rebuilding of freight cars came from the storage department at South Louisville and consequently a portion of the overhead attributable to the storage department was also capitalized as part of the cost of the rebuilt freight cars. Petitioner currently deducted the charges for vacation pay, holiday pay, payroll taxes, and health and welfare benefits applicable to the direct labor employed in building and rebuilding freight cars.

The cost incurred by a railroad in transporting its own material on its own line is referred to in the railroad industry as a dead haul cost. In determining the value for multilevel per diem purposes of the freight cars built and rebuilt at the South

Louisville shop the petitioner capitalized dead haul costs at a rate of 6.06 percent of the material costs. The 6.06-percent rate was based upon studies made by the Interstate Commerce Commission.

Except for payroll taxes and health and welfare benefits applicable to the indirect labor at the South Louisville shop all costs incurred in the operation of the South Louisville shop which could not be attributed directly to specific accounts were cleared at the end of each month to suspense account 8033. Included in such costs were all utilities, materials used to repair the shop, labor charges not allocable to any specific activity or department, and all other miscellaneous expenses incurred in maintaining that facility. The charges to suspense account 8033 were then allocated on a monthly basis to the various departments on the basis of the direct labor at the South Louisville facility which pertained to the respective departments. For example, if 20 percent of the total direct labor incurred at South Louisville pertained to building and rebuilding freight cars, then 20 percent of the expenses charged to suspense account 8033 were allocated to that department. The charges for payroll taxes and health and welfare benefits applicable to indirect labor at South Louisville were currently deducted by petitioner.

Various expenses incurred in maintaining the stores department which could not be allocated to specific accounts were charged to suspense account 8034. A portion of the expenses carried in this suspense account were periodically allocated to the various departments on the basis of the materials cost incurred by the different departments at the South Louisville shop as compared to the total material expense at the yard.

During the year 1964 the uniform system of accounts promulgated by the Interstate Commerce Commission provided in part as follows:

2-6 *Components of construction cost.* The cost of constructing property includible in the property accounts shall include the direct and other costs as described hereunder.

(a) *Cost of labor.* This includes the amount paid for labor expended by the carrier's own employees, including the cost of labor expended for preliminary work, such as sinking test holes or making soundings for tunnels, grading, buildings, and other structures; * * *
* * *

(e) *Cost of transportation.* This includes the amounts paid to other companies or individuals for the transportation of men, materials and supplies, special machine outfits, appliances, and tools in connection with construction. Freight charges paid foreign lines for the transportation of construction material to the carrier's line shall be included, so far as practicable, as a part of the cost of the material.

\* \* \*

2-11 *Units of property rebuilt or converted.*

\* \* \*

(d) The charge to the appropriate road and equipment account for rebuilt or converted units shall be the sum of (1) the cost (estimated if necessary) less a fair allowance for depreciation or the salvage value, whichever is lower, of the parts reused and (2) the cost of labor expended in rebuilding or in the conversion process and the cost of additional material applied. \* \* \*

The uniform system of accounts for railroads, in the section containing rules dealing specifically with railway operating expense accounts, provided in part as follows:

335 Employees Health and Welfare Benefits.

This account shall include premiums on group and other insurance policies covering annuities and other benefits for employees or their beneficiaries, contributions directly to employees health and welfare funds, and salaries and other expenses incurred directly in conducting relief, benefit, and medical departments for the benefit of officers and employees engaged in maintenance of equipment.

\* \* \*

532 Railway Tax Accruals.

\* \* \*

(c) Accruals for Federal income taxes shall be included in this account, except that the tax consequences of the items recorded directly in retained income accounts shall be included in account 617, "Federal income taxes assigned to retained income." \* \* \*

On March 28, 1969, the Interstate Commerce Commission issued the following interpretation of the correct accounting for certain costs related to self-constructed assets:

Variations have been noted in the accounting treatment accorded certain costs related to property construction and reconstruction programs performed by company labor. Instances have been noted where carriers have not capitalized labor-variable overheads.

In furtherance of proper accounting and uniform treatment of costs to be capitalized, the cost of labor is interpreted to include all related employment costs incurred for benefit of labor expended. Related employment costs include vacation pay earned, holiday pay earned, health and welfare benefits, group and other life insurance, company portion of pension and savings provisions, and Federal and other employment taxes, including the company portion of railroad retirement tax, and railroad unemployment insurance.

Accordingly, labor-associated costs applied to capitalized construction shall be allocated consistently on the basis of either direct labor dollars or hours, as appropriate in the circumstances, supported by experienced data. Arbitrary allocation methods shall not be used.

The revenue agent's report covering petitioner's taxable year 1964 included the following adjustments: (1) The charges for vacation pay, holiday pay, payroll taxes, and health and welfare benefits applicable to the direct labor employed in building and rebuilding freight cars constituted capital expenditures; (2) charges for payroll taxes and health and welfare benefits attributable to the indirect labor involved in building and rebuilding freight cars constituted capital expenditures; and (3) the petitioner's cost of transporting on its own lines the materials used in building and rebuilding freight cars constituted capital expenditures.

### Section 481 Adjustments

A "year of change" adjustment under the provisions of section 481 of the Internal Revenue Code of 1954 in the amount of $1,302,074.62 was also made in the revenue agent's report for the year 1964. For purposes of this adjustment, respondent went back for all of the years of the rebuilding program (1960-63) prior to the "year of change" and capitalized all of the costs he determined were overheads in addition to capitalizing "overheads" with respect to certain other capital costs incurred prior to the institution of the building and rebuilding programs. From this total adjustment he deducted the amount of post-1954 depreciation which would have been allowable up to 1964 with respect to those amounts had the "overheads" been capitalized in those earlier years rather than expensed. The total amount capitalizable for prior years adjusted for the "extra depreciation" was included in petitioner's income for the year 1964 as the "year of change" adjustment.[5]

---

[5] The issue involving capitalization of 1964 overhead expenses and the resulting sec. 481 "year of change" adjustment were raised by respondent after certain of the issues herein relating to the prior years had been tried. Although respondent could have raised the overhead issue in some of these earlier years, he did not do so. Our attention has not been directed to any provision of the law that (1) would require the respondent to raise the overhead issue in the prior open years, or (2) would prevent him from making the sec. 481 adjustment (taking prior years into account) without raising the overhead issue in the open years. The language of sec. 481 suggests strongly that it is not necessary to raise in prior years the issues which gave rise to the "year of change" adjustment. Sec. 481(a) states that such an adjustment can be made "in computing the taxpayer's taxable income for *any* taxable year." (Emphasis added.) Sec. 481(b) assumes it is possible for the issues giving rise

## Georgia and Clinchfield Railroad Adjustment

During the year 1964 the Georgia Railroad Co. and the Clinchfield Railroad Co. were operated under an agreement between petitioner and Seaboard Coast Line which provided that petitioner was entitled to one-half the income or loss from the operations of each of those railroads. In the revenue agent's report covering petitioner's taxable year 1964 the following adjustments were made: (1) With respect to the Clinchfield Railroad Co., the expenses attributable to flame-hardening and heat-treating rail constituted capital expenditures rather than currently deductible operating expenses; and (2) with respect to the Georgia Railroad Co., the provisions of Rev. Rul. 67-145, 1967-1 C.B. 54, and Rev. Proc. 68-46, 1968-2 C.B. 961, were applicable to both rail and other track materials.

Petitioner's distributive share of the income from the operation of the respective railroads was consequently increased to reflect the above adjustment made in the revenue agent's report. It has been stipulated that the issues involving the Georgia Railroad Co. and the Clinchfield Railroad Co. will be controlled by the Court's decision involving these same issues in petitioner's case.

OPINION

## Donated Property

The issue is whether petitioner may depreciate the cost of certain facilities paid for prior to June 22, 1954, from public funds.[6] Pursuant to written agreements between petitioner and various States and political subdivisions of the States, grade separations were constructed and grade-crossing safety devices and protective equipment were installed at designated points along petitioner's track system. Under the provisions of Federal

---

to the adjustment also to have been involved "in computing * * * taxable income for the 2 taxable years preceding the year of the change." Furthermore, the monetary limitations set forth in subsec. (b) effectively serve to prevent abuses resulting from the failure to raise issues in prior years.

[6] Sec. 113(a)(8) and sec. 114(a) of the Internal Revenue Code of 1939 provided that a nonstockholder-contributed asset acquired by a corporation had the same basis, subject to adjustment, for depreciation purposes as it had in the hands of the transferor.

However, under sec. 362(c) of the Internal Revenue Code of 1954 the basis to a corporation of property acquired after June 22, 1954, from a nonstockholder is zero.

highway aid legislation beginning with the Highway Act of 1916 and particularly the Federal Highway Act of 1933 (48 Stat. 203) and the Federal Highway Aid Act of 1944[7] the Federal, State, and local governments paid all or a portion of the costs of constructing the grade separations and crossing equipment. These facilities were constructed primarily to benefit the general public through improved safety and traffic flow. Petitioner also received incidental benefits from the constructed facilities such as the probability of lower accident rates and the ability to operate its trains at higher speed limits.

The cost of the grade separations constructed prior to June 22, 1954, with public funds was in the total amount of $13,827,597 and the cost of railroad crossing equipment constructed prior to June 22, 1954, with public funds was in the total amount of $561,892. In 1957 petitioner merged with the Nashville, Chattanooga & St. Louis Ry. Co. Prior to June 22, 1954, the Federal, State, and local governments had incurred costs of $1,172,067 in the construction of grade separations along the tracks of Nashville, Chattanooga & St. Louis Ry. Co. Neither petitioner nor the merged railroad capitalized the costs of the grade separations and crossing equipment paid from public funds and neither claimed depreciation with respect to such costs. Petitioner now claims a depreciation deduction on these assets acquired prior to June 22, 1954, with public funds.

This same issue was before the Supreme Court in *United States v. Chicago, B. & Q. R. Co.,* 412 U.S. 401 (1973). In that case the taxpayer (CB&Q) entered into a series of contracts with various States which provided that the States were to fund some or all of the costs of construction of specified improvements including grade separations and grade-crossing protective equipment. Federal reimbursement to the States for some or all of the costs incurred was authorized under the Federal Highway Act of 1933 and the Federal Highway Aid Act of 1944. CB&Q was to bear at least part of the costs of maintenance and replacement of the improvements once they had been installed. CB&Q contended that the facilities constructed with public funds represented contributions to its capital within the meaning of section 113(a)(8) of the Internal Revenue Code of 1939 and

---

[7] Under the 1944 Act (58 Stat. 838, 840-841) a railroad that received benefits from a constructed facility was liable up to a maximum of 10 percent of the cost of the project pro rata in relation to the benefits received.

that consequently it was entitled to a depreciation deduction on the subsidized assets acquired prior to June 22, 1954.

The Supreme Court, after a consideration of the decisional distinction between two earlier cases [8] involving the same issue with respect to nonshareholder contributions to capital, stated as follows:

We can distill from these two cases some of the characteristics of a nonshareholder contribution to capital under the Internal Revenue Codes. It certainly must become a permanent part of the transferee's working capital structure. It may not be compensation, such as a direct payment for a specific, quantifiable service provided for the transferor by the transferee. It must be bargained for. The asset transferred foreseeably must result in benefit to the transferee in an amount commensurate with its value. And the asset ordinarily, if not always, will be employed in or contribute to the production of additional income and its value assured in that respect. [412 U.S. at 413.]

The Court then applied these criteria to the CB&Q assets which were constructed with public funds and held that such assets did not qualify as contributions to capital. The Court stated in part as follows:

Although the assets were not payments for specific, quantifiable services performed by CB&Q for the Government as a customer, other characteristics of the transaction lead us to the conclusion that, despite this, the assets did not qualify as contributions to capital. The facilities were not in any real sense bargained for by CB&Q. Indeed, except for the orders by state commissions and the governmental subsidies, the facilities most likely would not have been constructed at all. * * * The transaction in substance was unilateral: CB&Q would accept the facilities if the Government would require their construction and would pay for them. Any incremental economic benefit to CB&Q from the facilities was marginal; its extent and importance were indicated and accounted for by the requirement that the railroad pay not to exceed 10% of the cost in relation to its own benefit. The facilities were peripheral to its business and did not materially contribute to the production of further income by the railroad. They simply replaced existing facilities or provided new, better, and safer ones where none otherwise would have been deemed necessary. As the Court of Claims found, the facilities were constructed "primarily for the benefit of the public to improve safety and to expedite highway traffic flow," and the need of the railroad for capital funds was not considered. * * * While some incremental benefit from lower accident rates, from reduced expenses of operating crossing facilities, and from possibly higher train speed might have resulted, these were incidental and insubstantial in relation to the value now sought to be depreciated, and they were presumably considered in computing the railroad's maximum 10% liability under the Act. In our view, no substantial incremental

[8] *Brown Shoe Co. v. Commissioner,* 339 U.S. 583 (1950); *Detroit Edison Co. v. Commissioner,* 319 U.S. 98 (1943).

benefit in terms of the production of income was foreseeable or taken into consideration at the time the facilities were transferred. * * * [Fn. refs. omitted; 412 U.S. at 413-415.]

We have here applied the criteria outlined by the Supreme Court in *Chicago, B. & Q. R. Co.* case and conclude that the assets constructed or acquired with public funds do not qualify as contributions to capital. It is readily apparent that the facilities were not actually bargained for by the petitioner. It is also apparent that there was no intention on the part of the governmental bodies to contribute to the capital of petitioner and no consideration was given thereto. Construction of these facilities was prompted by considerations of public safety and the evidence suggests that the impetus for these new facilities generally came from the various States and their political subdivisions. Without such instigation by governmental bodies and absent any governmental subsidies it would appear highly unlikely, especially during some of the financially troubled periods here involved, that these facilities would have been constructed. Negotiations with the public authority generally involved the type of facility which would be constructed and in some instances the allocation, if any, of the cost between the parties.[9] Such negotiations would be natural in view of the multiplicity of governmental agencies involved, the numerous types of grade crossings and railroad crossing equipment to be constructed, and the availability of aid under the different Federal programs in effect during the pre-1954 years. We cannot view these agreements reached by petitioner with the governmental agencies as a distinguishing feature in this case.

Any benefits received by the petitioner (such as the probability of lower accident rates and the ability to operate its trains at higher speeds) were incidental in nature and certainly not commensurate with the cost of the facilities. Moreover, it is evident that the grade separations and the grade-crossing safety devices were peripheral to petitioner's business and there is no suggestion in the record that they made any material contribution to the production of income. Finally, there is no merit to petitioner's argument that the obligation to maintain

---

[9] Petitioner recorded the portion of the costs it paid for grade separations and railroad crossing devices in certain designated accounts and during the years here involved claimed straight-line depreciation for Federal income tax purposes with respect to such costs. There is no dispute here as to such costs.

the facilities after their construction supports its claim for a depreciation deduction with respect to such facilities. See *United States v. Chicago, B. & Q. R. Co., supra.*[10]

We hold that the facilities constructed with public funds prior to June 22, 1954, did not constitute contributions to petitioner's capital within the meaning of the applicable statutes and, consequently, petitioner is not entitled to a depreciation deduction with respect to such facilities during the years here involved.

## Relay Rail

This issue involves the correct salvage value to be assigned to relay rail during the years 1955 through 1964 to the extent such rail was relaid in additions or betterments or represented an increment to inventory.[11] Relay rail is rail picked up from a portion of the track structure which is in sufficiently good condition to be relaid later in another line of track. If the rail picked up is not in sufficiently good condition to be reused as rail it is classified and sold as scrap.

During the years 1955 through 1964 petitioner accounted for its track accounts (including rail) under a system of depreciation accounting known as the retirement-replacement-betterment method (the retirement method). Under this method, petitioner capitalized all rail and other track materials at initial cost. No ratable deduction for depreciation was claimed and no depreciation reserve was maintained for the assets. When a particular asset (such as a section of rail) was retired without replacement, its cost as shown in the capital account, less salvage value, was deducted as a current expense. If a section of rail was replaced in kind the capital account was left undisturbed and the deduction consisted of the cost of the replacement less the salvage value of the replaced rail.[12] If the replacement involved an addition or a betterment, the cost attributable to such

---

[10] It should be noted that in *United States v. Chicago, B. & Q. R. Co.,* 412 U.S. 401 (1973), the taxpayer, in addition to the duties to maintain the facilities, had the added obligations to *replace* as necessary and at its own expense the facilities originally built.

[11] Respondent raised this issue with respect to the years 1955 through 1963 in an amendment to his answers filed in docket No. 5384-67 and docket No. 4614-67. Respondent therefore has the burden of proof on this issue with respect to those years. Rule 142(a), Tax Court Rules of Practice and Procedure.

[12] In this situation, i.e., a replacement in kind, if the rail laid in replacement was new, its cost as new rail was expensed. If the rail laid in replacement was used rail, the amount expensed was the assigned salvage value of such used rail.

addition or betterment was capitalized.[13]

Petitioner in its application of the retirement method of accounting during this period assigned a salvage value of $40 per net ton to relay rail.[14] Respondent contends that the salvage value assigned to relay rail should reflect current values and argues that a reasonable salvage value would be an amount equal to the average between the current cost of new rail and the price for scrap rail during the years here involved. Respondent's adjustment for these years applies only to the extent that relay rail is laid in additions or betterments and to the increments of relay rail in inventory.[15] Where rail is picked up and sold as scrap or is used as relay rail in a replacement in kind, it makes no difference as a practical matter what the salvage value is. Petitioner reports as ordinary income any gain realized from the sale of scrap rail and, consequently, any adjustment in the salvage value assigned to scrap rail (which went to reduce the current expense) is offset by the corresponding change in the gain realized upon the sale of such scrap rail. Similarly, any salvage value assigned to relay rail on pickup (which reduced current expense) is the same value which would be charged to current expense when such rail is relaid. In both instances any adjustment in the assigned salvage value results in a "wash" item. However, when relay rail is subsequently relaid as an addition or a betterment, some or all of its basis is capitalized and, consequently, the offsetting effect is postponed for what may be a substantial period of time.

Section 167(a)(1), which contains the general rule governing depreciation, allows "as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)" with respect to certain

---

[13] For example, if a section of 80-pound rail was replaced with 100-pound rail the cost attributable to the extra 20 pounds was capitalized and the balance of the cost (less salvage value of the 80-pound rail picked up) was currently expensed.

[14] During this same period, petitioner assigned a value of $30 per net ton to rail picked up and classified as scrap rail.

[15] Respondent introduced into evidence schedules showing the relevant tonnage of replaced reuseable rail for each of the years here involved. These schedules were based on approximately 84 volumes of petitioner's completion reports kept by petitioner in the ordinary course of its railroading activities over the years. The voluminous completion reports were in the custody of the Court and were of course available to petitioner. The schedules introduced in evidence were prepared under the personal supervision of a revenue agent who had some 18 years of prior experience in the railroad industry before becoming a revenue agent. Under these circumstances there is no merit in petitioner's objection to the introduction into evidence of these schedules and we here reaffirm our ruling made at the trial admitting such schedules and the supporting data into evidence.

business property. Under the provisions of section 167(b) a taxpayer may compute such "reasonable allowance" under any one of several designated depreciation methods or, with certain limitations, "any other consistent method productive of an annual allowance." The retirement method of accounting is a recognized alternative method of determining the annual cost incurred in the use of business property. *Boston & M.R.R. v. Commissioner,* 206 F.2d 617 (1st Cir. 1953); *Commissioner v. Union Pac. R. Co.,* 188 F.2d 950 (2d Cir. 1951); *Chicago & North Western Railway Co.,* 29 T.C. 989 (1958). In *Boston & M.R.R. v. Commissioner, supra,* the court focused upon the essential criterion of a rough equivalence between the annual depreciation method and the retirement method:

> It is important to note immediately that the final charge to expense upon the retirement of a piece of equipment is not to be understood as an effort to make up for the failure to take any prior yearly "depreciation" on this particular item during its useful life. Rather the underlying theory of the retirement method is that the charges to expense on account of all the items retired or replaced in any particular year are taken as a rough equivalent of what would be a proper depreciation allowance for *all* the working assets of the company for that year. The assumption is that once the system is functioning normally and the retirements are staggered fairly regularly, the charges to expense on account of equipment wearing out or otherwise disappearing from service are spread out and stabilized, and hence will approximate the results under straight-line depreciation. At the same time it is thought that this method will eliminate the not inconsiderable bookkeeping problem of making annual depreciation adjustments on account of each and every asset owned by an extensive railroad. Thus, under both methods, the total charges to expense on account of any particular asset—to the extent that such a segregated concept makes any sense at all under the averaging approach of the retirement system— are the same; also, if the retirements occur fairly regularly, the total annual charge on account of equipment becoming unserviceable should eventually tend to become roughly equivalent under both methods. However, under the retirement system the total capital account (i.e., the book value of the assets) is always higher, since under that system no adjustments are made in this account until an item is actually retired. [206 F.2d at 619.]

In Rev. Rul. 67-145, 1967-1 C.B. 54, the respondent required all railroads using the retirement method of accounting for depreciation of their track accounts to value their recovered track materials, including rail, at their fair market value. Implementation of the relevant ruling, however, presented complex valuation and accounting problems which would confront the railroads with virtually impossible tasks. Consequently, the respondent in Rev. Proc. 68-46, 1968-2 C.B.

961, provided a simplified procedure for making the necessary adjustments arising from the application of Rev. Rul. 67-145. Section 3 of Rev. Proc. 68-46 provided that for taxable years prior to May 8, 1967, instead of making fair market value determinations for such years of recovered track materials, taxpayers could determine the value of recovered reuseable track materials at an amount equal to the average of the fair market price for such track materials new and the market price for such track materials as scrap, as of the year of recovery. Such average price would be accepted by the respondent as representing the fair market value of recovered reuseable track materials for the taxable year.

In *Chicago, Burlington & Quincy R. Co. v. United States,* 455 F.2d 993 (Ct. Cl. 1972), revd. on another issue 412 U.S. 401 (1973), this same issue was before the court, i.e., the value to be assigned to reuseable rail, and the court upheld the respondent's approach to the valuation problem outlined in Rev. Rul. 67-145, *supra,* as modified by Rev. Proc. 68-46, *supra.* The Court of Claims stated in part as follows:

The issue turns on the manner in which plaintiff employs retirement-replacement-betterment accounting. As discussed earlier, plaintiff charges to expense the current cost of making rail replacements. The aggregate of such costs, reduced by the salvage value of replaced rail, thus represents the allowable depreciation deduction for such transactions for the account as a whole. After many years of an inflationary economy (particularly since World War II) and because rail has a long useful life (40-50 years), the current cost of making replacements (as opposed to retirements without replacement) bears no relationship to the historical cost of the rail in place. Thus, in 1955, plaintiff charged to current expense the $93.70 per net ton cost of laying new rail in replacement, even though the average cost of all rail in place was only $43 per net ton. The symmetry of replacement accounting demands that if the high costs of replacement are to be charged to current expense, then salvage value assigned to reuseable rail for relay as additions or betterments must correspondingly be based on current values. Otherwise, the allowable deduction for depreciation for the account as a whole is distorted, will in effect tend to constitute accelerated depreciation, and thus will not reflect a reasonable allowance for "exhaustion, wear and tear (including a reasonable allowance for obsolescence)," as required by § 167 of the Internal Revenue Code (1954). [455 F.2d at 1011-1012.]

In *Missouri Pacific Railroad Co. v. United States,* 497 F.2d 1386 (Ct. Cl. 1974), the Court of Claims reaffirmed its earlier decision holding that the salvage value of replaced reuseable rail should reflect current market values in accordance with Rev.

Rul. 67-145, *supra*. A similar result was reached by the Court of Appeals for the Eighth Circuit in *United States v. St. Louis-San Francisco Railway Co.,* 537 F.2d 312 (8th Cir. 1976), affg. an unreported case (E.D. Mo. 1975, 35 AFTR 2d 75-1317, 75-1 USTC par. 9395).[16]

We reach the same conclusion here. It is recognized that as to the years 1955 through 1963 the respondent has the burden of proof since this issue as to those years was raised by amended answer. Rule 142(a), Tax Court Rules of Practice and Procedure. We believe respondent has met the requisite burden of persuasion as to these years.[17] Insofar as this same issue involves the year 1964 our conclusion here is similarly based upon the record as a whole.

It is apparent on the basis of the entire record that the use of current market values for replaced reuseable rail is necessary to achieve under the retirement method an equivalent of a proper annual depreciation allowance for all of a taxpayer's assets. As we stated in the *Chesapeake & Ohio Ry. Co.,* 64 T.C. 352, 364 (1975), "The ultimate justification of its [the retirement method] use is that, through the aggregate yearly deductions stemming from the annual retirements, replacements and maintenance, the railroads will, in the course of an established and on-going business, recoup their capital investment, and that is the rough equivalent of depreciation." Under the retirement method petitioner charges to expense the current high costs for making rail replacements, which costs bear little relationship to historical costs of the rail in place. It is apparent that under these circumstances the salvage value to be assigned to the replaced rail (which salvage

[16] In *United States v. St. Louis-San Francisco Railway Co.,* 537 F.2d 312 (8th Cir. 1976), affg. an unreported case (E.D. Mo. 1975, 35 AFTR 2d 75-1317, 75-1 USTC par. 9395), the District Court stated that the method established in Rev. Proc. 68-46 for determining the fair market value of relay rail "is reasonable, and as such will not be upset without some evidence to rebut it." In affirming the District Court, the Court of Appeals upheld the respondent's valuation of the relay rail under the Rev. Proc. 68-46 method.

In *Chesapeake & Ohio Ry. Co.,* 64 T.C. 352 (1975), the taxpayer accepted the respondent's position that fair market value was the proper measure of value for replaced reuseable rail under the retirement method but contested the respondent's admittedly arbitrary formula for valuation proposed in Rev. Proc. 68-46.

[17] Respondent has offered proof of the sales price of the rails new and as scrap for each of the years involved and has used the average between the two as the fair market value of the rail in issue. Use of this formula prescribed in Rev. Proc. 68-46 has been accepted as a reasonable approach to the problem of valuation, see *Chicago, Burlington & Quincy R. Co. v. United States,* 455 F.2d 993 (Ct. Cl. 1972), and absent proof that the average between the two prices is improper, see *Chesapeake & Ohio Ry. Co., supra,* we find that respondent has met his burden of proof on this issue. See *Missouri Pacific Railroad Co. v. United States,* 497 F.2d 1386 (Ct. Cl. 1974).

value reduces the charges to expense) must also reflect current costs to prevent an obvious distortion in the allowable depreciation deduction for the rail account as a whole.

We have considered petitioner's exhaustive arguments and do not find them persuasive. In view of the obvious distortion in allowable depreciation resulting from an understatement of salvage value we cannot agree with petitioner's categorization of salvage value as a neutral factor in retirement accounting.[18] Nor do we believe that the principles of inventory valuation, which require that inventory items be valued at the lower of cost or market, are relevant here. This is not a typical case of inventory valuation since, as petitioner apparently recognizes on brief, these principles deal with the inventory of items held for sale and lose their significance when injected with the unrelated and highly unique area of retirement accounting. See *United States v. St. Louis-San Francisco Railway Co.* (District Court), *supra.*

Petitioner also argues that respondent's adjustment to the salvage value of relay rail constitutes a change in accounting method and that such a change may be made only if petitioner's method of valuation does not clearly reflect income. See *Thompson-King-Tate, Inc. v. United States,* 296 F.2d 290, 294-295 (6th Cir. 1961); sec. 446(b). It is unnecessary for us to determine herein whether respondent's adjustment amounts to a change in petitioner's method of accounting in view of the fact that petitioner calculated the value of its recovered rail in a manner which did *not* clearly reflect its income. See *United States v. St. Louis-San Francisco Railway Co., supra.* For the purposes of this case, the question of whether there has been a change in accounting method is therefore moot.[19] Even if such a change can be said to have occurred, a point on which we express no opinion, the respondent is not precluded from making the adjustment at issue. See sec. 446(b).

## *Welded Rail*

Respondent contends that within the context of the retirement-replacement-betterment method of accounting the costs of welding 39-foot rail lengths into strings of continuous welded rail

---

[18] Moreover, as we have discussed earlier, respondent's adjustment does not involve those situations (such as the replacement of rail in kind) which in the subsequent application of the retirement method result in "washes."

[19] The same conclusion was reached by the District Court in the *St. Louis-San Francisco* case, 35 AFTR 2d at 75-1323, 75-1 USTC at p. 86,988.

represent betterments and hence should be capitalized under the provisions of section 263.[20] Petitioner's position is that the welding costs should be added to the cost of the rail and currently expensed to the extent that such rail is laid in straight replacement.

Prior to 1959 the standard 39-foot lengths of rail used by petitioner in its track system were joined together by the use of angle bars and bolts. The joints between segments of rail are the weakest points in a track structure. Due to the discontinuity of rail surfaces at the joints, the loosening of bolts, and the wear in the contact area between the rail and the joint bars, problems are caused by the battering rail ends. Primary and secondary batter are constant problems with jointed rail.[21] A rail joint bar has about one-half the strength of the rail itself and in order to maintain the rigidity of the joint bar and avoid excess stresses on the rails it is necessary to tighten the joint bar bolts through periodic maintenance.

In 1959 petitioner began to replace sections of its jointed track system with continuous welded rail in which standard 39-foot lengths of rail were welded in continuous strings usually 1,053 feet in length. In 1959 petitioner installed about 38 miles of welded rail in its track system. By the end of 1964 about 213 miles of welded rail had been installed and by the end of 1972 approximately 1,538 miles of welded rail had been installed.

Under the retirement-replacement-betterment method of accounting, which petitioner has used during the period here relevant with respect to track accounts (including rail), the betterment portion of a rail replacement is capitalized. As stated by the Court in *Missouri Pacific Railroad Co. v. United States, supra* at 1396, "to the extent that a replacement functionally constitutes a betterment, the betterment portion is added to the capital account and the remaining portion of the replacement cost is charged to current expense."

Section 263, which concerns capital expenditures, provides that no deduction shall be allowed for any amount paid out for

---

[20] Respondent's position on the tax treatment under the retirement method of accounting for depreciation with respect to welding costs is set forth in Rev. Rul. 67-22, 1967-1 C.B. 52.

[21] Primary batter is the flattening of the rail end due to the discontinuity in the rail surface at the joint. Secondary batter, which usually occurs on the surface of the receiving rail at the joint, results from a rebound or descending blow on the receiving rail and causes a flattening of the rail end.

"new buildings or for permanent improvements or betterments made to increase the value of any property or estate." Section 1.263(a)-1, Income Tax Regs., defines such capital expenditures as "amounts paid or incurred (1) to add to the value, or substantially prolong the useful life, of property owned by the taxpayer, such as plant or equipment." The Uniform System of Accounts prescribed by the Interstate Commerce Commission for railroads defines a betterment in terms of functional improvement, i.e., a replacement which makes the property "more useful, more efficient, of greater durability, or of greater capacity." [22] Respondent's expert accounting witness also defined a betterment within the context of the retirement method as "an expenditure on property which will either increase the capacity of that property to perform service or will increase the efficiency of operation of that property so it turns out a higher quality product or service, or something that will decrease the cost of operation, or something that will increase the life of that property." Upon reflection we agree that a betterment within the context of the retirement method of accounting includes an expenditure (with respect to a replacement) which to a substantial extent increases the usefulness, capacity, or efficiency of the property involved, or one which contributes to the durability of the property or increases the life of that property.

Petitioner's assistant chief engineer testified that welded rail was installed to replace jointed rail in order to eliminate the defects inherent in the jointed areas. It is clear from the evidence that continuous welded rail substantially reduced the damaging wear and tear at the rail joints caused by primary and secondary batter. The welded area of continuous welded rail is as strong as the adjacent rail on either side and will last as long as the rail itself. With the installation of welded rail the number of bolted joints could be reduced from about 265 to 8 per mile of track. It is obvious that welding contributed substantially to the durability and usefulness of the rail and, with the elimination of the difficulties associated with jointed rail, served to lengthen to some degree the useful life of rail. Moreover, the record indicates that a material reduction in maintenance costs would result from the replacement of jointed rail with continuous welded rail, thus

[22] Uniform Systems of Accounts for Railroad Companies, I.C.C. Issue of 1962, p. 14 (as amended to Jan. 1, 1962).

contributing to the overall efficiency of the track system.[23] For all of these reasons we believe that the replacement of jointed rail by welded rail clearly constituted a betterment within the context of the retirement method of accounting. Cf. *Missouri Pacific Railroad Co. v. United States, supra; United States v. St. Louis-San Francisco Ry. Co.* (District Court), *supra; Atchison, Topeka & Santa Fe Railway Co. v. United States,* an unreported case (D. Kan. 1975, 36 AFTR 2d 75-5176, 75-2 USTC par. 9549).

Petitioner contends that its accounting practices with respect to welding costs were in accordance with Interstate Commerce Commission rules. We do not believe that the accounting interpretations prescribed by the Interstate Commerce Commission can be regarded as controlling and dispositive when they are in conflict with the applicable tax law, as set out in the Revenue Code and in pertinent Court decisions. *Old Colony R. Co. v. Commissioner,* 284 U.S. 552, 562 (1932). Cf. *Commissioner v. Idaho Power Co.,* 418 U.S. 1 (1974). In any event, it appears from the record that prior to 1966 a comprehensive study was made by the Commission to develop the proper accounting procedures to follow with respect to welded rail. This study was reflected in 1966 in the specific ruling by the Commission with respect to petitioner (as well as other railroads concerned with this same problem) that the welding costs incurred in the installation of continuous welded rail should be included in the property account, i.e., capitalized. Petitioner agreed to correct its accounting procedures with respect to the welding costs to conform with the stated position of the Interstate Commerce Commission. Against this background it would seem that petitioner's contention, even if relevant to the consideration of the issue before us, loses much of its force.

Petitioner also argues that if we view the entire track system as a single unit of property, the replacement of jointed rail with welded rail does not qualify as a capital expenditure under the criteria listed in section 1.263(a)-1, Income Tax Regs. Petitioner's argument, however, is refuted by the dictates of its own method of depreciation accounting used for the various track accounts,

---

[23] The evidence indicates that the replacement of jointed rail with welded rail would result in reduced maintenance costs of approximately $400 for each mile of rail replaced. The operating advantages and benefits of welded rail over jointed rail are reflected in the dramatic increase in its use by railroads generally since 1957. In that year there was a total of 550 miles of welded rail installed in the track systems of all railroads in the United States. By the end of 1969 some 25,742 miles of welded rail had been installed.

i.e., the retirement-replacement-betterment method of accounting. Under that method, which petitioner has used during the entire span of years here relevant, if a section of rail is replaced and such replacement involves a betterment (for example, an 80-pound rail 39 feet in length replaced by a 100-pound rail of the same length) the amount attributable to the betterment portion (20-pounds) is capitalized even though the impact of such replacement on the entire track system of the railroad is obviously infinitesimal. It can readily be seen that petitioner's argument misconstrues the correct standard to be used in determining, within the context of the retirement method of accounting, whether an expenditure involved in a rail replacement should be capitalized.

Petitioner has raised a question regarding the method of calculating the betterment herein. We find no authority for the suggestion that the welding costs at issue are to be capitalized only to the extent they exceed the costs of joining the same segments of tracks with angle bars and bolts. Since all of the welding activity discussed herein is directed at effecting a betterment, clearly all costs with respect thereto are subject to capitalization under the authorities discussed above. It is the excess of the current cost of welded rail over the current cost of nonwelded, unjoined rail of the same weight which must be capitalized. *Atchison, Topeka & Santa Fe Railway Co. v. United States, supra.* The current cost of the unjoined rail is expensed as a replacement under the retirement-replacement-betterment method. *Missouri Pacific Railroad Co. v. United States, supra,* 497 F.2d at 1396. As the court pointed out in the *Atchison, Topeka* case—

The practical effect is that the entire cost of the weld must be capitalized at the time a section of welded rail initially replaces sections of conventional rail. The court notes a similar *result* was reached in *Missouri Pacific R.R. Co. v. United States,* 497 F.2d 1386 (Ct. Cl. 1974) and in *United States v. St. Louis-San Francisco Railway Co., supra.* [*Atchison, Topeka & Santa Fe Railway Co. v. United States,* 36 AFTR 2d at 75-5182, 75-2 USTC at p. 87,605.]

We are persuaded on the basis of all the evidence that welded rail, when used to replace jointed rail, is functionally a betterment within the context of the retirement-replacement-betterment method of accounting and the welding costs for welded rail should be capitalized. We so hold. We find no merit

in petitioner's argument that the cost of the welding does not represent the amount of betterment that should be capitalized.

### Heat-Treated and Flame-Hardened Rail

The issue here is similar to that involving the welding cost of rail. Respondent contends that in the context of the retirement-replacement-betterment method of accounting the costs attributable to heat-treating and flame-hardening rail represent betterments and hence must be capitalized. Petitioner's position is that these costs should be added to the cost of the rail and currently expensed to the extent that such rail is laid in straight replacement.[24]

Rail is flame-hardened by the application of a torch plate to the rail surface, which process hardens the top of the rail to a depth of approximately one-quarter of an inch. The heat-treated rail used in petitioner's track system was hardened by the induction method, which process hardened the rail throughout its entire configuration.

Rail installed on a curve will wear much faster than rail on a tangent track. Depending on the degree of the curve and the nature of the traffic, the life of rail used on curves in petitioner's track system ranged from 6 months to 15 years. Beginning in 1963 and continuing through 1964 petitioner installed heat-treated and flame-hardened rail only on the curve segments of its main lines. This was done for the express purpose of extending the service life of rail in those segments. Petitioner's experience shows that the heat-treated and flame-hardened rail installed on curves had approximately 2½ times the service life of regular rail installed in those segments of the track. Petitioner continued to install heat-treated and flame-hardened rail in its track system through 1969. Subsequent to 1969 petitioner installed only the heat-treated rail.

We are persuaded, on the basis of this record, that the employment of flame-hardened or heat-treated rail in a replacement constitutes a betterment as that term has been earlier defined under the welded rail issue and consequently the expenditures incurred in such processes should be capitalized.

---

[24] If the heat-treated or flame-hardened rail used in a replacement is of heavier pattern weight than the rail being replaced, petitioner would capitalize that portion of the cost of the heat-treated or flame-hardened rail attributable to the increase in pattern weight and currently expense the remaining cost of such rail.

Such conclusion is inescapable in view of the appreciably longer service life of such rail in those track segments where the wear on rail installations was historically most severe. Petitioner's willingness to continue with the installation of flame-hardened and heat-treated rail over the years in spite of the significantly higher cost of such rail over regular jointed rail is cogent testimony to the increased usefulness and durability of the hardened rail.[25] Moreover, the testimony of respondent's expert witness supports a conclusion that within the context of the retirement-replacement-betterment method of accounting the costs of heat-treating and flame-hardening rail constitute betterments.

Petitioner makes much the same arguments here as those made under the welded rail issue. We have already considered the arguments in connection with that issue and have found them unpersuasive. With respect to petitioner's argument (which we have previously rejected) that its method of accounting for the cost of heat-treating and flame-hardening rail is in conformity with the accounting requirements of the Interstate Commerce Commission and therefore should not be changed, we need only add that the record simply does not establish the purported conformity in accounting treatment. Implicit in petitioner's argument is that the betterment rule in the retirement method of accounting should be limited to the weight factor alone. We find no apparent justification for this constrictive view in the record and we can perceive no compelling reason for accepting it. See *Atchison, Topeka & Santa Fe Railway Co. v. United States, supra;* see also *United States v. St. Louis-San Francisco Railway Co.* (District Court), *supra.*

### Grading and Ballast

The issue is whether petitioner is entitled to an abandonment loss deduction in 1964 under either section 165 or 167 with respect to a portion of the grading and ballast along a segment of its track where centralized traffic control was installed.[26]

---

[25] In 1963 and 1964 the average cost of new regular rail used by petitioner was about $120 per net ton. During this same period the cost of flame-hardened rail was about $160 per net ton while the price of heat-treated rail ranged in price from $194.89 per net ton in 1963 and $197.52 per net ton in 1964.

[26] The deductions claimed by petitioner in 1964 for the retirement of grading and ballast were in the respective amounts of $539,660.18 and $296,090.93. Respondent disallowed the grading retirement deduction in full and disallowed the ballast retirement deduction

Centralized traffic control is an electrical signal system which, through the use of switching equipment and bypass tracks, enables the movement of trains over a single track system on a line which previously required two parallel track systems. In 1964 petitioner installed centralized traffic control along the segment of its parallel track system between Winchester, Ky., and Corbin, Ky. When the new control system was installed large sections of the parallel track system (rails, other track materials, and ties) were removed, leaving in those areas a single line of track with occasional bypass tracks. None of the grading or ballast was removed.

To compute the amount of grading purportedly retired petitioner used as a standard the distance of 13 feet that separates the track centers on double track lines. Petitioner simply assumed that as a result of the track removal the grading (cuts and fills) attributable to the outside 13 feet was retired as no longer needed. Petitioner did not retire grading in those sections where bypass tracks remained in place. Where two main lines diverged petitioner retired all of the grading associated with the removed track.

A threshold dispute between the parties is whether the *grading* abandonment loss deduction is governed by section 165 or section 167.[27] Petitioner contends that the grading is a depreciable asset and argues that as a result of the track removal it is no longer a part of the track system. Petitioner recognizes that the grading is still intact and in place but argues that actual disposition of the asset is not a requisite of the loss deduction.[28] Respondent argues that the grading is a nondepreciable asset and that any loss sustained is governed by section 165 and consequently under the pertinent regulations, the property must be "permanently discarded from use" in order to qualify for the loss deduction. Sec. 1.165-2(a), Income Tax Regs.

---

to the extent of $250,359.37.

[27] With respect to the *ballast* retirement deduction, both parties base their arguments on sec. 167.

[28] Petitioner cites sec. 1.167(a)-8(a), Income Tax Regs., which provides in part as follows:

For the purposes of this section the term "retirement" means the *permanent withdrawal* of depreciable property from use in the trade or business or in the production of income. The withdrawal may be made in one of several ways. For example, the withdrawal may be made by selling or exchanging the asset, or by actual abandonment. In addition, the asset may be withdrawn from such productive use without disposition as, for example, by being placed in a supplies or scrap account. * * * [Emphasis added.]

We need not resolve this initial dispute between the parties since we are convinced that the result would be the same under either section 165 or section 167.[29] Although sections of rail and ties were removed when centralized traffic control was installed the grading remained in place and continued to serve a useful purpose (in several ways) in the conduct of petitioner's operations. On straight track the remaining single track was on occasion realigned from one side to the other of the existing roadbed. On curves the entire roadbed was in some instances used by realigning the single remaining track so as to reduce the degree of curve and thus reduce wear on the rails. Subsequent to 1964 petitioner added one additional bypass track over the roadbed where a single line of track had been removed in connection with the centralized traffic control installation. Further increases in the density of rail traffic on this segment of petitioner's track system would require additional bypass tracks. Moreover, the bypass tracks were first installed on the principle that the passing track should be at least as long as the longest train operated over the line. Petitioner's assistant chief engineer testified that the current theory was that the bypass track should be even longer in order to avoid a halt in either of the passing trains. Such uses and reasonably anticipated uses of the existing grading underscore its continuing value to petitioner.

Petitioner continued to use the portion of the roadbed where one track had been removed as a road for its maintenance vehicles. The grading that remained in place also provided additional drainage protection for the remaining track between Winchester and Corbin. It also provided protection to the remaining track from falling rocks and slides.

It is apparent on this record that petitioner continues to derive considerable benefits from the grading that remained in place. We believe that such benefits as well as the reasonably anticipated uses of the existing grading are wholly inconsistent with any purported intent to permanently retire or abandon such grading. Perhaps some shrinkage in the value of the grading

---

[29] Sec. 1.167(a)-8(a)(4), Income Tax Regs., provides in part as follows:

(4) Where an asset is retired by actual physical abandonment (as, for example, in the case of a building condemned as unfit for further occupancy or other use), loss will be recognized measured by the amount of the adjusted basis of the asset abandoned at the time of such abandonment. *In order to qualify for the recognition of loss from physical abandonment, the intent of the taxpayer must be irrevocably to discard the asset so that it will neither be used again by him nor retrieved by him for sale, exchange, or other disposition.* [Emphasis added.]

occurred when a line of track was removed as part of the centralized traffic control installation. However, a mere shrinkage in value is not enough to sustain a deduction under either section 165 or section 167 and the regulations promulgated thereunder. Abandonment constitutes not merely shrinkage in value but the complete elimination of all value in an asset and the recognition by the owner that the asset no longer possesses any utility. *Stanley Burke,* 32 T.C. 775, 780 (1959), affd. 283 F.2d 487 (9th Cir. 1960); *New York Sun, Inc.,* 27 T.C. 319 (1956), affd. per curiam 253 F.2d 487 (2d Cir. 1958); *Commissioner v. McCarthy,* 129 F.2d 84 (7th Cir. 1942). Here the record amply demonstrates the continued utility and value of the asset (grading) in petitioner's operations.[30] Consequently, the record simply does not support the contention that the grading was either permanently withdrawn or abandoned within the meaning of the regulations (cited above) promulgated under sections 165 and 167. We hold that petitioner is not entitled to the loss deduction claimed in 1964 with respect to the grading.[31]

Petitioner also claims an abandonment loss deduction in 1964 with respect to the ballast which purportedly was no longer used when large sections of track were removed between Winchester and Corbin as a result of the centralized traffic control installation. Under the applicable regulations petitioner, in order to qualify for this loss deduction, must show that its intent was "irrevocably to discard the asset so that it will neither be used again by him nor retrieved by him for sale, exchange, or other disposition." Sec. 1.167(a)-8(a)(4), Income Tax Regs. Moreover, as we have indicated above, abandonment constitutes the complete

---

[30] It is possible that petitioner may be entitled to an abandonment loss for grading and ballast under a single line of track that was removed, that is, where the former double tracks diverged and one of them was retired and removed as a result of CTC. However, "the taxpayer must establish that the property actually did lose its useful value, and that he, by reason thereof, actually did write off and abandon the property as an asset in the particular year for which deduction of the loss is claimed." *Stanley Burke,* 32 T.C. 775, 780 (1959), affd. 283 F.2d 487 (9th Cir. 1960). The evidence offered by petitioner is insufficient to establish the extent of such sections of grading and ballast or that those sections of grading and ballast were no longer used by petitioner for any useful purpose. The fact that petitioner wrote them off on its books alone is not enough.

[31] A similar result was reached in *Western Maryland Railway Co. v. United States,* 291 F.Supp. 935, 940 (D. Md. 1968). That case also involved a grading deduction claim in connection with the installation of centralized traffic control over a segment of taxpayer's track system. The court (without deciding whether sec. 165 or sec. 167 was applicable) concluded that the deduction was not allowable. The evidence indicated that the taxpayer continued to derive considerable benefit from the asset. The court stated that "Not until there has been a complete and permanent retirement or abandonment of the grading would the taxpayer be allowed a deduction under either § 167 or § 165."

elimination of all value in an asset and the recognition by its owner that the asset no longer possesses any utility. *Stanley Burke, supra; New York Sun, Inc., supra; Commissioner v. McCarthy, supra.*

Here the ballast was not removed and the record shows that petitioner continued to use it and derive significant benefits from the asset. It provided an "impervious" drainage area so that water falling on the track would not saturate into the fills. In places along the line the ballast was spread to serve as a base for the road used by petitioner's maintenance vehicles. As indicated above, after large sections of the parallel track system were removed as part of the centralized traffic control installation, the remaining track was realigned in various places over the existing roadbed both on straight segments of the track and on curves, thus utilizing the ballast (as well as the grading) in place. It would also appear that the ballast in place was utilized when an additional bypass track was later installed over the roadbed where a single line of track had been removed. Moreover, the ballast could obviously be utilized in the event that petitioner, prompted by the requirements of heavier traffic or by current changes in the engineering principles employed, could use the ballast in adding other bypass tracks or extending the length of the existing bypass tracks.

We do not believe that this record supports petitioner's contention that the ballast was permanently withdrawn or abandoned. The enumerated beneficial uses and reasonably anticipated uses for the ballast demonstrated by this record effectively contradict any purported intent to irrevocably discard the asset. The record is also clear that the asset continued to possess significant value and utility in the conduct of petitioner's operations. We must therefore hold on the basis of the entire record that petitioner is not entitled to the loss deduction claimed in 1964 with respect to the ballast.

### Birmingham Easement

The next issue is whether petitioner is entitled to a charitable deduction under section 170 with respect to an easement conveyed by petitioner to the City of Birmingham in 1960.

The term "charitable contribution" as used in section 170 has been generally held synonymous with the term "gift." *Harold DeJong,* 36 T.C. 896, 899 (1961), affd. 309 F.2d 373 (9th Cir.

1962); *Larry G. Sutton,* 57 T.C. 239, 242 (1971). In *Harold DeJong, supra,* this Court stated at page 899 that "A gift is generally defined as a voluntary transfer of property by the owner to another without consideration therefor." If a transfer is impelled primarily by the anticipation of economic benefit it is not a gift. *Rainier Companies, Inc.,* 61 T.C. 68, 77 (1973), affd. as to this point in an unpublished opinion (9th Cir., Nov. 5, 1975); *Charles O. Grinslade,* 59 T.C. 566, 577 (1973); *Larry G. Sutton, supra.* In *Singer Co. v. United States,* 196 Ct. Cl. 90, 449 F.2d 413, 422 (1971), the court stated that a transfer did not qualify as a charitable contribution under section 170 if such "transfer was made with the expectation of receiving something in return as *quid pro quo."* See also *Stubbs v. United States,* 428 F.2d 885, 887 (9th Cir. 1970).

We do not believe that the transaction here involved, viewed in its entirety, constituted a charitable transaction. Instead, as the evidence clearly reveals, the transaction was a carefully integrated business transaction through which the petitioner expected to receive, and did in fact receive, economic benefits commensurate with the value of the property transferred to the City.

The evidence shows that early in 1958 the petitioner and the City of Birmingham were discussing, and were fully aware of, the mutual benefits that would accrue to both parties from the transaction here in issue. At that time the petitioner's passenger station in Birmingham was located in the vicinity of Morris Avenue and 19th Street. Early in 1958 petitioner's superintendent informed the city commissioner that "It is our purpose to recommend to our Management that the Railroad Company convey to the City of Birmingham right of way for extending 19th Street under our tracks with the understanding that the City of Birmingham will bear all costs in connection with the construction of underpass and all costs that will accrue to the Railroad on account of constructing additional stairways, etc., to serve Birmingham passenger station." In a reply letter the City of Birmingham indicated its full agreement with this proposal.

In June 1959 petitioner entered into a contract for the construction of a new passenger station adjacent to the west side of 19th Street on Morris Avenue and it was anticipated that the new passenger station would be completed on or about April 15,

1960. In April 1960 petitioner conveyed an easement (100 by 260 feet) to the City of Birmingham for its planned extension of 19th Street southward from Morris Avenue and its construction of the 19th Street underpass beneath petitioner's property. The section conveyed by petitioner to the City contained the old passenger subway used by petitioner's passengers to reach the existing passenger station. The City of Birmingham, in consideration of petitioner's agreement to convey the easement, agreed to construct at the City's expense a new passenger subway and a new baggage room in connection with petitioner's new passenger station on the west side of 19th Street on Morris Avenue. The City also agreed to install a new transformer room for petitioner's new passenger station, subway, and related facilities. The fair market value of the easement conveyed by petitioner to the City of Birmingham was approximately $200,000.[32] The cost incurred by the City of Birmingham in the construction of petitioner's new passenger subway, transformer, and luggage room was approximately $175,000.

We can find no element of charity or genuine donative intent in the transfer of the easement to the City. Instead, the record reveals a purely business arrangement for the mutual advantage of the parties, a quid pro quo. Moreover, the evidence establishes that the economic benefits received by petitioner were fully commensurate with the value of the property transferred to the City. Hence there is no support for a contention that an element of bargain sale existed in the transfer with a contribution equal to the bargain element.

We hold on the basis of the entire record that petitioner is not entitled to a charitable deduction under section 170 with respect to the transfer of the easement to the City of Birmingham in 1960.

## Overhead Expenses

The next issue is whether certain costs incurred by petitioner in 1964 are includable in the cost basis of freight cars built or rebuilt by petitioner at its South Louisville shop.

Since 1903 petitioner has maintained a freight car repair shop in South Louisville, Ky., for heavy repairs to its freight cars. In

---

[32] This figure does not include the value, if any, of the old passenger subway (or any other improvement) which had a basis on petitioner's books of approximately $7,000 as of Jan. 1, 1960.

1960 petitioner initiated a program for rebuilding freight cars at its South Louisville shop. An assembly line technique was adopted for renewing the entire body of a freight car at one time. Construction was also begun in 1960 on a new shed for housing the assembly line. Petitioner used four of the existing tracks in the South Louisville shop for the building and rebuilding program.

During the years 1960 through 1964 petitioner rebuilt a total of approximately 7,500 freight cars, or an average of about 1,500 a year. During the years 1962, 1963, and 1964 petitioner also built approximately 100 new freight cars at its South Louisville shop. In 1964 approximately 300 employees were involved in the building and rebuilding program at the South Louisville shop. Pursuant to union regulations, the freight car shop would announce that a rebuilding program was about to begin and employees in the shop were entitled to bid for jobs in the program. Such bids were honored on the basis of seniority.

Petitioner capitalized the cost of direct labor and materials employed in the rebuilding program as part of the cost of the newly built and rebuilt freight cars. Petitioner also capitalized as part of the cost its adjusted basis in the parts and materials salvaged from the dismantled cars and reused in the rebuilding program. Some materials used in the rebuilding program came from the storage department at South Louisville and consequently a portion of the overhead attributable to the storage department was also capitalized as part of the cost of the newly built and rebuilt freight cars. Petitioner currently deducted the charges for vacation pay, holiday pay, payroll taxes, and health and welfare benefits applicable to the direct labor employed in building and rebuilding freight cars.

Except for payroll taxes and health and welfare benefits applicable to indirect labor at the South Louisville shop all costs incurred in the operation of the South Louisville shop which could not be attributed directly to specific accounts were cleared at the end of each month to suspense account 8033. Included in such costs were all utilities, materials used to repair the shop, labor charges not allocable to any specific activity or department, and all other miscellaneous expenses incurred in maintaining that facility. The charges to suspense account 8033 were then allocated on a monthly basis to the various departments (including the building and rebuilding of freight cars) on the basis

of the direct labor at the South Louisville facility which pertained to the respective departments. The charges for payroll taxes and health and welfare benefits applicable to indirect labor at South Louisville were currently deducted by petitioner.

Various expenses incurred in maintaining the stores department which could not be allocated to specific accounts were charged to suspense account 8034. A portion of the expenses in this suspense account were periodically allocated to the various departments on the basis of the materials cost incurred by the different departments at the South Louisville shop as compared to the total material expenses at the yard.

Respondent contends that the following items (which petitioner currently deducted) should be capitalized as part of the cost of the newly built and rebuilt freight cars: (1) The charges for vacation pay, holiday pay, payroll taxes, and health and welfare benefits applicable to the direct labor employed in building and rebuilding freight cars; (2) the charges for payroll taxes and health and welfare benefits attributable to the indirect labor involved in building and rebuilding freight cars; and (3) the petitioner's cost of transporting on its own lines the materials used in building and rebuilding freight cars. Respondent also made a "year of change" adjustment under the provisions of section 481 for the year 1964 in the amount of $1,302,074.62.

Section 263(a)(1) provides that no deduction shall be allowed for "any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." Section 1.263(a)-2(a), Income Tax Regs., provides that "the cost[s] of acquisition, construction, or erection of buildings, machinery and equipment, furniture and fixtures, and similar property having a useful life substantially beyond the taxable year" are examples of capital expenditures. Section 446(b) provides that if the method of accounting used by taxpayer "does not clearly reflect income, the computation of taxable income shall be made under such method, as in the opinion of the Secretary or his delegate, does clearly reflect income."

Respondent argues that petitioner employed an improper method of accounting and consequently understated the actual cost of the newly built and rebuilt freight cars in the South Louisville shop. Section 446 vests the respondent with broad latitude in determining the correctness of a method of

accounting. See *Automobile Club of Mich. v. Commissioner,* 353 U.S. 180 (1957); *S. Garber, Inc.,* 51 T.C. 733, 736 (1969). An incorrect method of accounting does not become acceptable simply because it is consistently used over a period of time. See *Photo-Sonics, Inc.,* 42 T.C. 926, 935 (1964), affd. 357 F.2d 656 (9th Cir. 1966).

It is generally recognized that the costs incurred in the acquisition of capital assets are to be treated as capital expenditures. See *Woodward v. Commissioner,* 397 U.S. 572, 575 (1970). This principle has been applied to the costs incurred by a taxpayer with respect to self-constructed assets. In *William K. Coors,* 60 T.C. 368 (1973), affd. sub nom. *Adolph Coors Co. v. Commissioner,* 519 F.2d 1280 (10th Cir. 1975), cert. denied 423 U.S. 1087 (1976), this Court agreed with respondent's determination that the taxpayer, in accounting for its self-constructed assets, was required to capitalize certain construction department overhead costs as well as other construction-related costs. This Court held that the taxpayer's method of accounting, which in essence charged capital assets only with the direct costs involved in placing them in service, did not clearly reflect income.[33] We stated at page 398 as follows:

> We think respondent has not abused his discretion in requiring a change in the company's method of accounting for self-constructed assets. As our previous discussion indicates, the method of accounting used by the company fails in two major respects to clearly reflect income and is therefore erroneous. First, it causes a distortion of current income by causing cost of goods sold to be over-stated in the current year and, in a corresponding amount, causes the cost of self-constructed assets to be understated. Secondly, it causes a distortion of the current year's income to the extent that capital construction costs are deducted as current expense. The cumulative effect is to take as current expense or as a part of cost of goods sold amounts which should be capitalized and recovered through depreciation in later years. This will cause the income in future years not to be clearly reflected. Moreover, from the standpoint of commercial accounting, the practice of capitalizing only certain direct costs ₁ f new capital construction is not an acceptable method of accounting in the unique factual setting of this case, and is unacceptable for Federal income tax purposes. See and compare *Ben Perlmutter,* 44 T.C. 382 (1965), affd. 373 F.2d 45 (C.A. 10, 1967).

---

[33] Respondent's method of accounting advocated in the *Coors* case, as in the present case, for self-constructed assets is generally referred to as the *full cost absorption method.* The *direct costing method* employed by the taxpayer in the *Coors* case omits fixed costs from its consideration.

A similar issue was involved in *Commissioner v. Idaho Power Co.,* 418 U.S. 1 (1974). In that case the taxpayer used its own transportation equipment and employees in the construction of improvements and additions to its capital facilities. The Supreme Court held that depreciation on such transportation equipment must be capitalized to the extent that such depreciation was allocable to the taxpayer's construction of capital facilities. The Court discerned little difference between construction-related depreciation and the other construction-related items such as tools, materials, and wages paid construction workers which are generally treated as part of the cost of acquisition of a capital asset. The Court emphasized that the capitalization of construction-related depreciation "prevents the distortion of income that would otherwise occur if depreciation properly allocable to asset acquisition were deducted from gross income currently realized." The Supreme Court further stated:

> An additional pertinent factor is that capitalization of construction-related depreciation by the taxpayer who does its own construction work maintains tax parity with the taxpayer who has its construction work done by an independent contractor. The depreciation on the contractor's equipment incurred during the performance of the job will be an element of cost charged by the contractor for his construction services, and the entire cost, of course, must be capitalized by the taxpayer having the construction work performed. The Court of Appeals' holding [which was reversed by the Supreme Court] would lead to disparate treatment among taxpayers because it would allow the firm with sufficient resources to construct its own facilities and to obtain a current deduction, whereas another firm without such resources would be required to capitalize its entire cost including depreciation charged to it by the contractor. [418 U.S. at 14.]

We have applied these principles here and conclude that respondent's adjustments must be sustained. Under the circumstances of this case we are persuaded that only the full cost absorption method, as here applied, will correctly reflect income.[34] The various adjustments in issue listed above which

---

[34] The parties appear to agree that the three acceptable methods of accounting for the overhead costs involved with respect to self-constructed assets are the full cost absorption method, the direct costing method, and the incremental cost method. Under the incremental cost method the amount capitalized includes in addition to direct costs the increments in overhead which result from the construction activities.

Petitioner's method of accounting with respect to its freight car construction program appears to be a hybrid method which conforms to none of the accepted accounting practices in this area. There is simply no support in the record for petitioner's contention that it was employing the incremental cost method of accounting for the costs of its freight

are attributable to both direct and indirect labor involved in building and rebuilding freight cars are not unlike the other expenditures (such as wages and materials) which are incurred. From the viewpoint of both accepted accounting practice and established tax principles such items must be capitalized as part of the cost of constructing the capital assets in question. We can perceive no logical distinction between these disputed items and the other construction-related expense items.

Petitioner relies upon *Fort Howard Paper Co.*, 49 T.C. 275 (1967), which also involved the correct accounting treatment of overhead expenses in determining the cost of self-constructed assets for tax purposes. This Court sustained the taxpayer's long-standing practice of capitalizing only the direct costs of labor and materials connected with self-constructed items. We believe that the *Fort Howard Paper Co.* case is clearly distinguishable. In that case the activities of the taxpayer were incidental to its paper manufacturing business. Employees were used to construct capital assets only during slack periods when such assignments did not interfere with their regular functions. Moreover, it did not appear that there was any increase in overhead costs which could be directly identified with self-constructed assets. Under those circumstances we recognized that the incremental cost method of accounting for self-constructed assets, which petitioner had used consistently for many years, clearly reflected its income. Here, the magnitude and scale of petitioner's freight car building program, the method in which employees chose to participate in such programs, and the special measures taken by petitioner at the South Louisville shop to implement the program clearly indicate that the factual situation here does not fit the mold of the *Fort Howard Paper Co.* case. See *William K. Coors, supra.*

We must also sustain respondent's determination that the cost of transporting on its own lines the materials used by petitioner in the freight car construction program must be capitalized as part of the cost of the self-constructed capital assets. As indicated above, the Supreme Court held in the *Idaho Power Co.* case that depreciation on the taxpayer's transportation used in the construction of improvements and additions to its capital

---

car construction program and, in fact, petitioner admits on brief that it did not use "an unqualified incremental cost approach."

facilities must be capitalized as part of the cost of such capital facilities in order to prevent a distortion of income. In *Great Northern Railway Co.,* 8 B.T.A. 225, 263 (1927), affd. 40 F.2d 372 (8th Cir. 1930), cert. denied 282 U.S. 855 (1930), the then Board of Tax Appeals reached a similar conclusion as to the cost of online transportation of men and materials used by the taxpayer in connection with additions and betterments, holding that such costs were "properly capitalized." The same result was reached in *Missouri Pacific Railroad Co.,* 22 B.T.A. 267, 286 (1931). We believe that the rationale of the above cases is equally applicable here.

### Section 481 Adjustments

Section 481(a) provides that if the computation of a taxpayer's income for any taxable year is under a method of accounting different from the method employed in the preceding taxable year, certain adjustments must be taken into account to prevent amounts from being duplicated or omitted solely by reason of the change. Under the regulations a change in the method of accounting includes, in addition to a change in the overall method of accounting, a change in the treatment of a material item. Sec. 1.481-1(a)(1), Income Tax Regs.

Respondent's adjustments in this case, including changes in petitioner's accounting treatment for tax purposes of vacation pay, holiday pay, payroll taxes, and health and welfare benefits applicable to direct labor, the accounting treatment of payroll taxes and health and welfare benefits applicable to indirect labor, and the accounting treatment for costs of certain online transportation of materials clearly involve a change in the treatment of a material item and hence constitute a change in method of accounting within the meaning of the provisions of section 481. See *Fruehauf Trailer Co.,* 42 T.C. 83 (1964), affd. on another issue 356 F.2d 975 (6th Cir. 1966); see also *Peoples Bank & Trust Co.,* 50 T.C. 750 (1968), affd. 415 F.2d 1341 (7th Cir. 1969). We conclude that respondent made a proper adjustment under the provisions of section 481(a)(2). It is readily apparent that the adjustments are necessary to prevent the omission or duplication of amounts. Petitioner's incorrect method of expensing cost items which should have been capitalized clearly distorted income over a period of years including the year 1964. We can find no justification, in view of the unambiguous language of the statute,

for limiting the section 481 adjustments to the year 1964 alone. Nor does the fact that the change in the method of accounting involve self-constructed assets somehow vitiate the need for such adjustments.[35] See *William K. Coors, supra.*

In accordance with the foregoing,

*Decisions will be entered under Rule 155.*

---

[35] Petitioner claims that respondent is in effect changing its method of accounting retroactively to the year 1960 and subsequent years, which years are still open, and that the proper way to have made the adjustments would have been to capitalize the expenses and disallow the claimed deductions in the years 1960-63 rather than bunch them in the year 1964. Petitioner also argues that if the year of change is 1964, only those construction-related expenses incurred in 1964 and subsequent years should be capitalized and added to basis for depreciation; thus, there would be no double deduction of the expenses incorrectly deducted in the years 1960-63. This argument has appeal, and were the circumstances different, we might give further consideration to it. But see n. 5, p. 988. However, the only reason we are concerned with the year 1964 is because of a claimed net operating loss carryback from that year. Respondent made a separate audit of the year 1964 for purposes of determining the loss for that year and only in that audit did he make the change in method of accounting. He was therefore justified in making the 481 adjustments in that year alone.