LOWELL H. WILSON AND JOAN A. WILSON, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Wilson v. Commissioner
Docket Nos. 9438-80, 9439-80, 9440-80, 9441-80.
United States Tax Court
T.C. Memo 1982-131; 1982 Tax Ct. Memo LEXIS 612; 43 T.C.M. (CCH) 799; T.C.M. (RIA) 82131; March 18, 1982. Thomas H. Pirnie, for the petitioners. Genelle F. Schlichting, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: In these consolidated cases respondent determined the following deficiencies in the Federal income taxes of petitioners: Petitioners
Dkt. No.
Year
Deficiency
Lowell H. Wilson
9438-80
1971
$ 16,542.65
and Joan A. Wilson
Robert C. Blythe
9439-80
1971
8,310.00
and Sandra L. Blythe
1975
2,627.00
Donald A. Wilson
9440-80
1971
11,412.00
and Madonna Wilson
1972
260.00
1975
1,997.00
1976
656.00
Donald A. Wilson
9441-80
1973
355.00
1974
337.00
The issues for decision are: 1. Whether Glebe, Inc., a subchapter S corporation *613 of which petitioners were shareholders during Glebe's fiscal year ended April 30, 1971, is entitled to an abandonment loss deduction in that fiscal year. 2. Whether petitiones have properly raised the issue of whether Glebe, Inc. can deduct certain amounts as maintenance expenses during its fiscal year ended April 30, 1971. 3. If petitioners have properly raised the issue of whether Glebe, Inc. can deduct certain amounts as maintenance expenses, whether petitioners have established such amounts are ordinary and necessary expenses rather than capital expenditures and whether they have established the amount of such expenses. FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time petitioners filed their respective petitions in these cases their legal residences were as follows: Petitioners
Legal Residence
Lowell H. Wilson
Jupiter, Florida
and Joan A. Wilson
Robert C. Blythe
Cedar Rapids, Iowa
and Sandra L. Blythe
Donald A. Wilson
Nashville, Tennessee
and Madonna Wilson
Belle Plains, Iowa
Donald A. Wilson
Nashville, Tennessee
Until July 2, 1971, all of petitioners were shareholders of Glebe, Inc. (hereinafter *614 Glebe). However, after July 2, 1971, none of the petitioners herein were shareholders of Glebe because on that date they entered into a Settlement Agreement in which petitioners Lowell Wilson, Donald Wilson and Robert Blythe sold all their respective shares of stock to the Glebe Corporation. Glebe was incorporated under the laws of Virginia on May 25, 1967, with an initial capitalization of $ 1,000; the stock was issued at $ 1 par value per share as follows: Lowell H. Wilson
230
Donald A. Wilson
230
Andrew N. Wilson
230
Jack A. Clark
180
Robert C. Blythe
130
Total
1,000
The purpose of the corporation was to purchase approximately 412 acres of land in Virginia, develop the property and sell the improved lots under contracts for deed with Glebe retaining title to the lots until the purchase price had been paid in full. The shareholders each had specific duties to fulfill in the performance of development of the 412 acres. Their duties were as follows: Jack A. Clark
Advertising, supervision
of construction of
water mains and recreation
area
Andrew N. Wilson
Clearing, constructing
road network
Donald A. Wilson
Supervise surveying the
entire project and construct
recreation area
Lowell H. (Ike)
Sales
Wilson
Robert C. Blythe
Corporate management,
financial planning and
recordkeeping
*615 For the fiscal year ended April 30, 1969, and subsequent, Glebe elected and its shareholders elected to report its income and file its returns as a small business corporation (subchapter S). For the fiscal year ended April 30, 1971, Glebe reported its income from the sale of lots on the accrual method. However, the parties have stipulated that the installment method of accounting should have been used for reporting Glebe's income from the sale of lots for its fiscal year ended April 30, 1971. A portion of the parcel of land in Virginia owned by Glebe had percolation problems. On September 19, 1968, a letter from Westmoreland County Health Department to Glebe confirmed a September 3, 1968, soil investigation which concluded that the seasonal water table found at the shallow depths of 8 to 12 inches rendered the land unsuitable for a septic tank and drainfields. Another problem was that many of the lots sloping toward the creek would need sewerage pumped back up the slope which would be impossible because drainlines could not be located on the waterfront due to shellfish restrictions. In March 1969, a soil study by Consultants, Inc. of McLean, Virginia, found the land to *616 be unsuitable because of the high water table. On June 19, 1969, Attorney Harry Frazier advised Glebe Attorney J. Clifford Hutt about legal remedies available to challenge the County Health Department for its failure to approve sewage disposal on about 100 acres of Glebe land. On May 26, 1970, the Regional Sanitarian for Virginia Department of Health, wrote to Dr. J. K. Cunningham, Director, Westmoreland County Health Department, recommending that commitments not be made to Glebe to issue septic tank permits as a means of sewage disposal for a portion of Glebe's subdivision. On December 17, 1970, petitioner Blythe, on behalf of Glebe, requested that Westmoreland County Health Department monitor a portion of Glebe land having non-percolable problems. Although Glebe has made efforts to sell the non-percolable land, it still owns the approximately 120 acres having percolation problems. The main road for the project goes through the 120 acres having percolation problems and is tied to the other road networks of the project. Ditches were constructed in the area having percolation problems, which construction was necessary to get access to the entire project, to maintain *617 the main road, and to drain other areas developed and sold as lots. Most drainage ditches that were constructed in the non-percolable land area added to the value of other lots that were in the percolable land area. By draining part of the non-percolable land area, Glebe was able, in 1972 and 1973, to enlarge some of the lots for which the owners were not able to get building permits, and by so doing Glebe salvaged these lots by meeting percolation requirements. The area having percolation problems has a camping area and water systems. Andy Wilson, who was in charge of digging ditches and roughing roads was paid $ 200 for labor performed for Glebe in Virginia. Of this amount, $ 160 was for meetings on May 1-2 and September 8-9, and $ 40 was for labor in November 1970. This represented one day of work at the Glebe project since the shareholders were paid $ 40 per day. Andy Wilson supervised the work that was done to the non-percolable acres. Petitioner Donald Wilson, who was in charge of constructing the clubhouse and the beach areas, spent time at the Glebe project during the fiscal year ended April 30, 1971, working on the clubhouse and beach areas. He was paid $ *618 5,386 for labor at Glebe for the year ended April 30, 1971, which at $ 40 per day represented approximately 135 days work at the Glebe project. During the fiscal year ended April 30, 1971, the balance of the land and construction costs account of Glebe increased from $ 27,000 to $ 173,149 or an increase of $ 146,149. Petitioner Blythe, who was responsible for Glebe's recordkeeping, made the entries in the land and construction costs account of Glebe based on check registers and check spread sheets which categorized the amounts spent. He also prepared summary sheets from the check registers before posting to the general ledger. The original check spread sheets used by Blythe to post amounts to the land and construction costs account were analyzed and summarized by Revenue Agent Keating. The land and construction costs account for the fiscal year ended April 30, 1971, included (1) $ 47,084.83 for payroll expense for Glebe's construction crews; (2) $ 44,147.29 spent for the construction of the clubhouse and bathhouses; (3) $ 19,728.50 paid to Tebb's Construction, of which $ 14,450 had the notation "Road" (Tebb's Construction was also paid for seawall work done to protect the *619 lots and the beach area); and (4) $ 1,989.75 paid to Virginia Tractor for equipment used for the water system. The construction crew employees of Glebe worked principally on the swimming pool, clubhouse, the beach areas and the blacktopping from May 1, 1970 through April 30, 1971. Glebe was obligated to complete recreational areas, install a water system, build retaining walls and beach areas around the perimeter of the lots, construct swimming areas, construct a clubhouse and bathhouses, put in a swimming pool, construct a camping area, continue to maintain the roads until there were a certain number of houses per mile and maintain the unsold lots and the common area. As of May 1, 1970, Glebe was still working on blacktopping the roads, constructing the beach areas, clubhouse, bathhouses, and the water system. In a document dated July 13, 1970, and prepared by Blythe, Glebe estimated that as of May 30, 1970, its future costs were $ 50,000 for the clubhouse, $ 50,000 for the roads, $ 20,000 for the water system and $ 20,000 for miscellaneous, all of which totaled $ 140,000. As of June 30, 1970, Glebe estimated its future costs were $ 30,000 for the clubhouse, $ 35,000 for *620 the roads, $ 20,000 for the water system and $ 20,000 for miscellaneous, or a total of $ 105,000. The construction costs or costs of goods sold actually incurred by Glebe were in excess of the original estimate of 34 percent of sales. Petitioners could not show that $ 100,000 was spent working on the non-percolable land. Most of the work done on the non-percolable land was done before May 1, 1970. To the extent that expenditures attributable to the non-percolable land had been put in the land and construction costs account prior to Glebe's fiscal year beginning May 1, 1970, such amounts had been charged off since the account was written down to $ 27,000 as of May 1, 1970. Blythe reduced the land and construction costs account each year by 34 percent of the gross sales price stated on the contracts rather than the amounts received by Glebe on the installment contracts each year. The reduction in the land and construction costs account each year had an offsetting debit to deferred income, which debit reduced the amount of deferred income to be recognized in future years and was therefore treated as a cost of goods sold. The projected future costs of $ 140,000 and *621 $ 105,000 were considered by Blythe as part of the 34 percent cost assumption for the project. No abandonment loss was claimed by Glebe on either its original income tax return or its amended tax return for its fiscal year ended April 30, 1971. OPINION 1. Claimed Abandonment Loss Deduction
We must first decide whether Glebe, a subchapter S corporation of which the petitioners were shareholders, is entitled to an abandonment loss deduction in its fiscal year ended April 30, 1971.
Section 165(a)[2] provides that there shall be allowed as a deduction any loss sustained during the taxable year. Section 1.165-1(d)(1), Income Tax Regs., provides in part that: [A] loss shall be treated as sustained during the taxable year in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year. * * * A loss deductible under section *622 165(a) may occur on the abandonment of property. Haspel v. Commissioner,62 T.C. 59 (1974). Section 1.165-2(a), Income Tax Regs., provides: A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a) for the taxable year in which the loss is actually sustained. For this purpose, the taxable year in which the loss is sustained is not necessarily the taxable year in which the overt act of abandonment, or the loss of title to the property, occurs. This Court has stated that to be entitled to an abandonment loss the taxpayer must demonstrate an intention "to abandon the property, coupled with an act of abandonment, both of which must be ascertained from all of the surrounding facts and circumstances." Boston Elevated Railway Co. v. Commissioner,16 T.C. 1084, 1108 (1951), affd. 196 F.2d 923 (1st Cir. 1952); *623 Massey-Ferguson, Inc. v. Commissioner,59 T.C. 220 (1972). The requirements for establishing an abandonment loss were stated in Commissioner v. McCarthy,129 F.2d 84, 87 (7th Cir. 1942), as follows: The rule to be deduced from the "abandonment" cases, we think, is that a deduction should be permitted where there is not merely a shrinkage of value, but instead, a complete elimination of all value, and the recognition by the owner that his property no longer has any utility or worth to him, by means of a specific act proving his abandonment of all interest in it, which act of abandonment must take place in the year in which the value has actually been extinguished. * * * This rule has been followed by this Court. Louisville & Nashville Railroad Co. v. Commissioner,66 T.C. 962, 1007 (1976), affd. on this issue 641 F.2d 435 (6th Cir. 1981); Burke v. Commissioner,32 T.C. 775 (1959), affd. 283 F.2d 487 (9th Cir. 1960). *624 The year in which an abandonment loss is sustained is basically a factual question to be determined from all the pertinent facts and circumstances. Boston Elevated Railway Co. v. Commissioner,supra.Petitioners, of course, have the burden of proving that the loss occurred in the year in which the deduction is claimed. Boehm v. Commissioner,326 U.S. 287 (1945); Rule 142(a), Tax Court Rules of Practice and Procedure.
It is clear that a taxpayer may have an investment in a particular part of real property that is separate and distinct from his investment in the land and may be treated separately for Federal tax purposes. Sexton v. Commissioner,42 T.C. 1094 (1964).
Petitioners contend that there is an intangible asset separate and apart from the land, i.e., $ 100,000 of the "land and construction costs" attributable to non-percolable land. To the contrary, respondent contends that the petitioners have failed to establish the existence of an intangible asset or Glebe's cost basis in such an asset. In addition, respondent contends that petitioners have failed to establish that there was an intent to abandon or an act *625 of abandonment which occurred in Glebe's fiscal year ended April 30, 1971, and that there was not a closed and completed transaction occurring in that fiscal year which gave rise to an abandonment loss deduction. We agree with the respondent. Petitioners rely entirely on Mr. Blythe's testimony. He said that the land and construction account was used by him as an "account of convenience" in which entries were made which did not conform to the title of the account. His testimony was confusing as to whether he believed the amounts he posted to the land and construction costs account were capital expenditures or maintenance expenses. If they were maintenance expenses, they would not constitute a capital asset which could be the subject of an abandonment loss. A.J. Industries, Inc. v. United States,503 F.2d 660, 663 (9th Cir. 1974). Moreover, Blythe said that all costs for the project were posted to this account and not just costs attributable to the non-percolable land. As of May 1, 1970, the beginning of the April 30, 1971 fiscal year, the account had been written down to $ 27,000, all other costs having been charged off. Blythe admitted he could not establish *626 the costs incurred in fiscal year April 30, 1971, attributable to the non-percolable land. Consequently, the petitioners have not established that there is an intangible asset, such as construction costs attributable to the non-percolable land. Even if an intangible asset exists, it has not been established that Glebe had a cost basis in the asset. Petitioner argues that about $ 100,000 of the land and construction costs account increase during the fiscal year April 30, 1971, was attributable to the non-percolable land area. But the evidence shows otherwise. An analysis of the check spreads, which were prepared by Blythe or under his supervision and used by him to post amounts to the land and construction costs account, shows the amounts attributable to certain specific categories. Both the check spreads themselves and Jack Clark, one of the shareholders of Glebe, identified these expenditures as attributable to aspects of the project other than the non-percolable land. In fact, there is no evidence of any specific amount spent for the non-percolable land during the Glebe fiscal year ended April 30, 1971. Therefore, petitioners have failed to establish that Glebe had a cost *627 basis in any intangible asset which could be subject to abandonment. Not only have petitioners failed to establish the existence of an intangible asset or Glebe's cost basis in any such asset, but they have also failed to establish an intent to abandon or an act of abandonment in Glebe's fiscal year ending April 30, 1971. Property must be "permanently discarded from use" in order to qualify for an abandonment loss deduction pursuant to section 165. Louisville & Nashville Railroad Co. v. Commissioner,supra.Here the non-percolable land and any of the capital improvements made to it, including ditches, roads, water systems, and camp area, remained in place after April 30, 1971, and continued to serve a useful purpose in many ways to the conduct of Glebe's operations. As Mr. Clark testified, the main road for the entire project runs through the non-percolable land area. Also, the ditch in the non-percolable land, which ties in to smaller ditches, drained the surface water of the entire project so that petitioners were able to get access to the entire project. The *628 ditches and culverts in the non-percolable land area enabled Glebe to maintain the main road. The non-percolable area and improvements made thereon provide an impervious drainage area for the entire project. Because of the capital expenditures made to the non-percolable land, Glebe was able to salvage some of the surrounding land area by either permitting better drainage or by adding to the size of lots so that building permits could be obtained. Some of this additional salvaging of lots occurred after the fiscal year ended April 30, 1971. In view of these facts, petitioners have not shown that Glebe "permanently discarded from use" in its fiscal year ended April 30, 1971, either the non-percolable land area or the capital improvements that have been made to the non-percolable land area. The road system and the drainage system in this area tie into the remaining project and provide drainage protection to the entire project. Jack Clark testified that after April 30, 1971, Glebe derived considerable benefits from the improvements to the non-percolable land area that remain in place. Such benefits, as well as the reasonably anticipated future use of the non-percolable land area *629 and its improvements, are inconsistent with any purported intent to permanently retire or abandon the capital improvements to the non-percolable land. Even if there was some shrinkage in the value of the non-percolable land, it was certainly not enough to sustain a deduction under section 165 and the regulations promulgated thereunder. Abandonment constitutes not merely shrinkage in value but the complete elimination of all value of an asset and the recognition by the owner that the asset no longer possesses any utility. See Louisville & Nashville Railroad Co. v. Commissioner,66 T.C. at 1007. The evidence here shows continued utility and value of the capital improvements to the non-percolable land in the operations of Glebe after its fiscal year ended April 30, 1971. Therefore, since petitioners have failed to establish an intent to abandon or an act of abandonment which occurred in Glebe's fiscal year ended April 30, 1971, it follows that there was not a closed and completed transaction fixed by identifiable events occurring in that fiscal year which gave rise to an *630 abandonment loss deduction. In their effort to meet their burden of proving their contention that between $ 90,000 and $ 115,000 in expenditures were made for the specific purpose of trying to make non-percolable land percolate so that it would be available for platting, the petitioners failed to analyze and identify the amounts which were spent on the non-percolable land. They chose to rely only on the vague and self-serving statements of petitioner Robert Blythe. Despite their contention that their spread sheets of the account had been misplaced, they did not informally request, subpoena, or produce any documents from respondent, Jack Clark or Glebe relating to the records of Glebe, and particularly the spread sheets prepared by Mr. Blythe to post amounts to Glebe's land and construction account. At the trial respondent introduced into evidence a summary of the spread sheets of Glebe and, pursuant to Rule 1006, Federal Rules of Evidence, was required to produce the original records at the request of petitioners. However, petitioners made no request to see the original records of Glebe. Mr. Blythe, who prepared or supervised the preparation of the original spread sheets of *631 Glebe and who made the entries in the land and construction account, would presumably know what these records contained. Hence we infer from petitioners' failure to use the original books and records that, if produced, they would not support their contention. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Moreover, we have more than this inference to rely on in concluding that petitioners have not met their burden of proof. The summaries of the amounts in the land and construction account presented by Revenue Agent Keating show that over $ 100,000 of the amount in the account was attributable to the construction of a clubhouse, bathhouses, roads, seawall, beach area and a water system.There was no rebuttal of his summary. 2. Claimed Maintenance Expenses
Alternatively, the petitioners raised for the first time at the beginning of the trial that some amounts in the land and construction account should be allowed as maintenance expenses. Although respondent, as he contends, was prejudiced by the delayed raising of this issue, no evidentiary support for this position was offered *632 by petitioners other than the testimony of Mr. Blythe which we think is confusing and contraditory. For example, he testified that all of the construction costs had not been spent by the fiscal year in issue. He admitted that he prepared a projection of $ 140,000 for future construction costs for the project as of May 31, 1970. He further admitted that this projection for clubhouse, roads, water system and miscellaneous was included in the 34 percent estimated construction costs for the project, thereby acknowledging that these amounts were capital costs, or costs of goods sold, for the project. He specifically admitted that all of the construction costs in the 34 percent estimate had not been spent by April 1970, and that the actual construction costs ran higher than his 34 percent estimate. Additionally, Mr. Blythe made the entries to the land and construction account and testified that entries to this account were from "general checks and any disbursement which related to the land and development costs." He also testified there should have been $ 25,000 from the land and construction costs account allocated to a basis for items to be recovered from the lot owners' association. *633 He suggested that $ 40,000 should have been left in the account as a basis for the 125 acres of the non-percolable land. He also said that 39 percent, rather than 34 percent, should have been left in the account. In short, his testimony is unclear as to just how much petitioners claim were "maintenance expenses." Moreover, the petitioners' first contention that all of the costs are capital expenditures is totally inconsistent with their claim that some of the amounts are deductible maintenance expenses. Consequently, on this record, we reject the petitioners' arguments that they are entitled to deduct any amounts as maintenance expenses. To reflect our conclusions on the disputed issues and other necessary adjustments, Decisions will be entered under Rule 155.
Footnotes
1. Consolidated herewith are the following cases: Robert C. Blythe and Sandra L. Blythe, docket No. 9439-80; Donald A. Wilson and Madonna Wilson, docket No. 9440-80; and Donald A. Wilson, docket No. 9441-80.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated.↩